SARAH A. NEAL AS EXECUTRIX, &C., OF WILLIAM M. C. NEAL, APPELLANT, VS. IVEY H. GREGORY, ET AL., APPELLEES.

1. Mistake in the execution of a deed in that it was not executed under seal, must be clearly shown in order to its reformation.

2. Payment of the purchase money alone or delivery of the property the consideration for land agreed to be sold does not give the purchaser the right to maintain a bill to enjoin sale under execution upon a judgment obtained by a judgment creditor of the party agreeing to make the deed. The remedy of the party delivering the property is at law for its value. An interest in land cannot be thus acquired except to the extent permitted by the statute of frauds, and the party delivering the property has no greater equity than that of a general creditor to an amount equal to the value of the property delivered.

3. A *bona fide* purchaser for value without notice from a fraudulent grantee gets a good title as against a creditor of the fraudulent grantor. Where, however, the paper purporting to be a deed from grantor to grantee is not under seal no title passes to the alleged grantee and he can make no title to the purchaser.

4. Where the alleged fraudulent grantor is present at the purchase from the alleged fraudulent grantee at the *request of the purchaser* his, the grantor's, simple silence unaccompanied by any misrepresentation as to the state of the title, or of proof of knowledge upon his part of the title, or that his silence was in any way the inducement of the purchase, or that he was guilty of any concealment, and where the proof shows affirmatively that all the transactions of the alleged grantor with the purchaser up to that time were based upon a claim of title in himself, and where the purchaser aware of the inconsistent claim of title is guilty of extraordinary laches and negligence in not examining the county records which disclose the actual state of the title, no estoppel operates to transfer the interest or estate of the alleged grantor in the land to the purchaser.

5. The retention of the possession of land after absolute sale accompanied with the exercise of unequivocal acts of ownership over it is a badge of fraud for it is not in the usual course of business and indicates a secret trust for the debtor.

6. In case of such a sale and retention of possession accompanied by appropriation of the rents and profits and acts of ownership the burden of proof is upon the party asserting the existence of and payment of the consideration named in the deed, and claiming the benefit thereof to establish such facts.

Appeal from the Circuit Court for Gadsden county. The suit was begun in Liberty county.

The following statement of the case was prepared by Mr. Justice Westcott:

This suit was instituted in chancery by the appellant's testator, who sought to enjoin sales of the land which is the subject of this controversy under executions issued upon judgments obtained on the 19th of April, 1869, by John T. Seegar for the use of C. H. DuPont and Ivey H. Gregory in the aggregate sum of three thousand one hundred and twenty-four twenty-nine one-hundredths dollars against Thomas D. Nixon, who has died since the rendition of the judgments, the defendant, William H. Neal, being his administrator. The suits were instituted in the early part of 1867. The general equity claimed is that the land is not the property of the defendant in execution, plaintiff alleging the fact to be that anterior to these judgments against Nixon he became the owner of the land by virtue of a deed from Atkins, Dunham & Co., who had purchased the land and held a deed therefor from the defendant in execution, Nixon. What purports to be the deed from Nixon to Atkins, Dunham & Co. is dated the 26th June, 1866, covers the land in controversy, "together with certain personal property" for the expressed consideration, being eight thousand dollars ($8,000) in hand paid. There is no seal to this deed. One purpose of the suit is to reform the deed, it being alleged that the omission to seal the intended deed occurred through mistake or accident. The deed of Atkins, Dunham & Co., dated the 29th February,

1868, to appellant, William M. C. Neal, (the plaintiff in the original bill) is not made the subject of objection on account of any want of compliance with the law in the matter of its execution and delivery.

Plaintiff alleged that he was induced to make the purchase of A., D. & Co. by the representations of Nixon, who at the time was acting as agent of A., D. & Co.; that Nixon accompanied him to Apalachicola, and was present and cognizant of the purchase by plaintiff of A., D. & Co.; that shortly after this purchase Nixon left the United States, and has since died insolvent; that the plaintiff went into possession of the land under the deeds upon Nixon's departure from the place, and that the suits which resulted in the judgment under which the sales are sought to be had were pending against Nixon at that time. Plaintiff prayed for reformation of the deed and for order enjoining the sales under execution. The defence is no mistake in the deed to A., D. & Co.; that it was a fraudulent conveyance without consideration; that Nixon was at the date of this conveyance, and before that time, indebted to the plaintiff in execution and others in large sums of money, " and was in embarrassed and failing circumstances;" that after the pretended sale Nixon remained in absolute and undisturbed possession of the property, appropriating its proceeds.

Defendants allege that Nixon sold and appropriated to his own use all of the personal property embraced in the conveyance to A., D. & Co. without any objection by A., D. & Co.; they deny that N. was the agent of A., D. & Co., and affirm that the consideration for the deed from A., D. & Co. to Neal was the amount of money which was due and owing by Nixon to Atkins, Dunham & Co. for credits extended to Nixon after his deed to them.

The testimony was substantially as follows :

The plaintiff for himself in his direct examination testi-

fies: That he purchased the land of Atkins, Dunham &
Co., but as the wives of the parties were not present to re-
linquish dower, the deed was not immediately executed;
that the circumstances attending the sale were: that he re-
ceived a letter from Atkins, of the firm of A., D. & Co.,
telling him that they owned the land; that he and T. O.
Nixon went to Apalachicola where he had an interview
(Nixon being present) with Atkins and Beale, Dunham be-
ing absent. Here the contract of purchase was made. In
accordance with this contract of purchase the deed was
subsequently executed and delivered. Nixon with his
family left the State the day after the interview; that he
(witness) gave his notes for the purchase-money at the time
the contract was made to Atkins, who was to attend to the
execution and delivery of the deed to him, trusting to the
honor of Atkins to have the deed executed and delivered,
which was subsequently done as stated in the deed; the
notes have since been paid. There were thirteen or fifteen
bearing orange trees on said land at the time of said pur-
chase, and thirty or forty young trees from a foot to three
feet in height. Over 300 trees have been added since, about
one-half of which are now bearing. He went into possession
two or three days after his return from Apalachicola after
making the contract of purchase. Nixon made no objec-
tion then or since.

Cross-examination:

He received the letter from Atkins three or four days be-
fore he went to Apalachicola with Nixon in the year 1868.
This letter was the first intimation he had of any claim
upon the land by A., D. & Co. Beale said he would not
take less than $2,300 for the land, but upon consultation
between Atkins and Beale they agreed to take his notes
for seventeen hundred and odd dollars. He does not know
whether Nixon received any benefit of the purchase

money; that upon his arrival at Apalachicola, when he went to the office of A., D. & Co., he found only Beale present; that he returned to the boat; that afterwards, on being sent for, he returned to the office, he thinks, accompanied by the engineer of the boat. On reaching the office Beale said they owned the land, but would not take less than $2,300 for it. This witness refused to give. Beale and Atkins had a private conversation. They informed him they would take his notes for seventeen hundred and odd dollars for said lands, the notes to be placed in the hands of Atkins, and a deed to be subsequently executed and delivered to him through Atkins; that Nixon, next previous to his departure, had been residing on said land for five years or more, but not continuously, and that witness went into possession a day or two after his departure; that witness went into possession before he received said deed, and that he is now the owner of it.

This witness introduced by the defendant testifies: That he does not recollect being at spring term, 1867, of the Circuit Court for Liberty county, nor does he recollect requesting or employing Colonel S. B. Love to enter an appearance in the suits against Nixon, and has no recollection of said suits; that about a week before Nixon's departure he purchased of him two cows, two calves, one mule, a yoke of steers and one sow; that Nixon sold the balance of his personal property to other persons around there. This purchase by him was made before he went to Apalachicola.

Ivey H. Gregory, direct for the defendants, testified: That Nixon, before his departure for South America, resided upon the place now occupied by W. H. Neal, and that he, Nixon, occupied it for ten or more years just previous to his departure; that Nixon left about the 15th of January, 1868; that he owned cattle, horses, mules and farming implements within two years before his departure

from Florida; that he was in possession of such property within six months before his departure; that he saw in the possession of several parties (naming them) cattle in the mark of Nixon which had been in Nixon's possession six months previous to his departure; that Nixon owed witness about $5,000 when he left Florida; that he visited Nixon during the years 1866 and 1867; that the property he was in possession of he was trading with and controlling as his own; that he had conversations with Nixon in regard to the settlement of the debt due him by Nixon now.

Defendant's solicitors here asked the following questions: State what Nixon said to you in regard to his pecuniary condition and the status of his property in the conversation which you had with him about twelve months prior to his departure from Florida in relation to the settlement of the demands which you held against him? This question was excepted to as being in contravention of the statute. The witness answered as follows: I went down to see Nixon. When I met him he told me that he owned nothing but his clothing, had sold out lock, stock and barrel; that witness asked to whom; Nixon said to Atkins, Dunham & Co., of Apalachicola, Florida. Witness asked him, have you got the money? Nixon said yes. Witness then said, you can pay me, and pulled out his notes. No, I can't pay you, said Nixon; that this portion of the conversation was in the presence of Nixon's family; that Nixon then called the witness out privately and told him that he could not pay him, that he got no money from the sale of his property; that witness asked him why? He said, because it was a sham sale, but it appeared on record as a *bona fide* sale; that witness then told him that he would not have done anything of the kind. Nixon asked him why? that he replied, that these men had no lease upon their

lives, and what would become of him at their deaths.
Nixon then told witness that he had a private instrument
of writing at the bottom of his trunk where no one went
but himself, and if A., D. & Co., or their administrators,
attempted to do anything of the kind he would produce
that paper. Nixon then told witness to keep this to him-
self, that he said Nixon told witness that instead of acting
as a brother-in-law he had acted as a brother and would
keep it. Witness told him, no, if you don't pay me and
my brother's estate I will expose the whole thing. Nixon
said, for heaven's sake don't do it, for I intend to pay
you and your brother's estate, and I did not do what I
have done to defraud you or your brother's estate, if there
is any honor in me. When witness left him next morn-
ing he said that he would certainly comply with the prom-
ise he had made. This conversation took place about a
year before Nixon left. W. M. C. Neal told the witness
the winter that Nixon left Florida that he had purchased
the property in controversy from Nixon. He said that he
gave oranges for it, and witness was present when part of
the oranges were delivered by Neal's team. Witness does
not recollect the quantity of oranges to be given. This
was in December, 1867. Witness was at Rico's the day
after Nixon left, and Moore, Nixon's son-in-law, was in
charge of the furniture which Nixon left to be delivered to
different parties. Moore soon after left for Bristol, and
W. M. C. Neal took possession of the land. Witness saw
Neal about a month after Nixon left. Florida, and Neal
told him that Nixon had treated him very badly; that in-
stead of having satisfied Atkins, Dunham & Co., as he told
him he had done, he left without doing it, and that he,
Neal, would have it to pay. As near as witness can recol-
lect Neal stated that the amount due Atkins, Dunham &
Co. from Nixon was from fifteen hundred to eighteen hun-

dred dollars. Neal stated that Nixon not settling with Atkins, Dunham & Co. would cause him to have to pay for the place twice, and also stated that he had received a letter from Atkins, Dunham & Co. telling him that Nixon had not settled with them.

Harris, for defendants, testifies that he lived near Nixon, and that Nixon used and sold a quantity of the personal property on the place, and that when he turned over the place to Neal he delivered two mules; that Nixon did not sell all of his cattle, but told witness that he could have all he could find in his mark.

John Walker, for defendants, testified that he was living with Nixon at the time he left Florida, and had been for two years previous thereto. The substance of his testimony is, that Nixon sold a large part of the personal property, and turned the remainder over to Neal; that Nixon told him that he had sold the lands to Atkins, Dunham & Co., but the personal property was still his.

The plaintiff, Neal, being re-examined, testified that he originally purchased the lands in controversy from Thomas D. Nixon for 100,000 oranges; he paid him, and demanded the title; Nixon told him that as soon as he could go to Columbus he would make him the deed; that soon after this he was going down the river, and Captain Whitesides told him that Nixon did not own the place, that it belonged to Atkins, Dunham & Co.; that when he reached Apalachicola Beale told him the same thing; that he returned home and sent his son William to Apalachicola, and about two days thereafter he received a letter from John Atkins stating that the firm owned the land; that this is the letter of which he spoke to Ivey Gregory; that he exhibited the letter to Nixon and requested him to go to Apalachicola to see the firm of Atkins, Dunham & Co.; that they went, and he made the contract of purchase re-

ferred to; that Captain Whitesides told him also that Nixon was going to leave on the return of the steamer, and he did so leave. This testimony was excepted to as not being in rebuttal. To that relating to conversation with Nixon, because he is dead and his administrator is a party defendant. To that detailing conversation with Whitesides and Beale, because it is hearsay.

W. H. Gunn testified that while he was Clerk of the Circuit Court for Liberty county in 1866 the original deed of Nixon to A., D. & Co. was handed to him by Nixon to be recorded, and that he recorded it upon the acknowledgment of Nixon, and that Nixon said it was his deed conveying his place.

Upon the hearing, the Chancellor having given the plaintiff an opportunity to reform his bill " so as to claim title directly from Nixon, and not through A., D. & Co.," which he did not avail himself of, dismissed the bill without prejudice to the right of the plaintiff to file a new bill setting up title under purchase directly from Nixon.

From this decree plaintiff appeals, and assigns as grounds for reversal of decree:

First. Because the court should have ordered a reformation or amendment of the deed from Nixon to Atkins, Dunham & Co., according to the prayer of the bill.

Second. Because the court refused to enjoin the defendants, Gregory and Seegar, from enforcing their executions against the land.

Third. Because the court dismissed the bill denying any relief.

[W. M. C. Neal having subsequent to suit died, his testatrix, Sarah Ann Neal, was made party complainant in the Supreme Court. William H. Neal, who is named in the bill as a defendant, as administrator of the estate of Thomas D. Nixon, does not appear from the record to have been

served with process, or to have appeared or plead to the bill. No point of this kind, we are informed, was made before this court.—REP.]

*Stephens & Love* for Appellant.

*John W. Malone* for Gregory and for H. B. Seegar as administratrix of John T. Seegar.

MR. JUSTICE WESTCOTT delivered the opinion of the court.

As to the first ground upon which a reversal of the decree is sought, a failure of the court to order a reformation of the deed, it is very clear that there was no error. The accident or mistake alleged in the bill is directly denied by the answer supplemented by an averment that the deed was made to defraud creditors, and there is no proof at all of any mistake or accident. Proof of mistake in the manner of the *execution* of an instrument whenever admissible should be very clear.

Neal, the plaintiff, before the deed from Atkins, Dunham & Co. to him, and before he had any knowledge of any conveyance, or any pretended conveyance, from Nixon to Atkins, Dunham & Co., purchased this land of Nixon for one hundred thousand oranges paid him, and Nixon agreed verbally to give him a deed therefor. The decree of the Chancellor here was without prejudice to any right of Neal to file a bill setting up *title* by virtue of this purchase. If Nixon's administrator is in such position that he can make no title the remedy of Neal arising out of this transaction is an action at law for the value of the oranges, and if the title remained in Nixon, and upon his death the land became subject to the statute of descents and occupies the relation of the real estate of a decedent, then as against a parol vendee (Neal) from the decedent in his lifetime, the vendee

only paying the purchase-money, his judgment creditor in his lifetime would be preferred. Under such parol sale no title passed to Neal, and the title being in Nixon the judgment became a lien upon the land. It is thus apparent that Neal by virtue of the payment of the oranges acquired no title superior to the lien of the judgment creditors of Nixon, and that so much of the decree as is based upon that view is erroneous.

The statute of frauds prevents the acquisition of any interest in the land by Neal under such purchase. No interest in the land was required. No decree for specific performance could have been had. Basford vs. Pearson, 9 Allen, 387 ; Kidder vs. Hunt, 1 Pick., 328 ; Seymour vs. Bennett, 14 Mass., 266 ; Brown's Statute of Frauds, 4th Edition, page 136, §118 ; Tate vs. Jones, 16 Fla., 216 ; Purcell vs. Minor, 4 Wall., 513.

Say the Supreme Court of the United States in the case last cited : " Payment of price in whole or in part will not of itself be sufficient for the interference of a court of equity the party having a sufficient remedy at law to recover back the money." It is thus apparent that as to the orange transaction Neal stood to Nixon as to the land in relation, having no greater equity than that of a general creditor to an amount equal to the value of the oranges he delivered.

So far as the acts of Neal, the grantee of Atkins, Dunham & Co., are concerned we do not see that the evidence shows that he was aware of any fraud on the part of Nixon or Atkins, Dunham & Co. in the sale of the land by Nixon to Atkins, Dunham & Co. The facts seem to be that he was not aware of such sale until after he had purchased the land of Nixon and had paid the oranges agreed to be paid ; that he was then informed that A., D. & Co., and not Nixon, had the title ; that he, in company with Nixon, proceeded to Apalachicola and took a deed from A., D. & Co., Nixon

being present and silent when the agreement of purchase was made. The price agreed to be paid for the land by Neal he subsequently paid after entering into possession, and there is no evidence that it was not the full value of the property.

The rule is that a *bona fide* purchaser for value without notice from a fraudulent grantee gets a good title. "As against the debtor the fraudulent deed is effectual, and the fraudulent grantee has a title and right to alienate. The only infirmity in his title is its liability to be impeached by creditors. As to all others it is perfect, and when it has passed into the hands of a *bona fide* purchaser for value without notice even this infirmity is cured and the title becomes sound and indefeasible." Bump on Fraud. Con., 2d Ed., 482, and cases cited ; Jackson vs. Walsh, 14 Johnson, 415.

This brings us to the question whether A., D. & Co. had any title to convey.

What was the nature of the transaction between Nixon and A., D. & Co. as to the instrument executed by Nixon to them? The answer denies positively that there was any consideration for the alleged deed. The proof shows none, but on the contrary it appears that subsequent to the execution of the paper Nixon remained in possession of the property for years, appropriating the rents and profits of the land and making absolute sales of the personal property, A., D. & Co. making no objection thereto. No explanation of these facts is attempted. Such a sale as this is void as against creditors. Such possession and such acts generate a legal presumption of fraud when not explained so as to bring them within the operation of the exceptions to the general rule, that a conveyance accompanied by such acts render the deed void as to creditors. In this case these acts not only tended to deceive, but did in fact deceive Neal to

such an extent as to cause him to purchase the property of Nixon, and to pay him the oranges agreed upon. Neal, to the extent of this purchase, is and was a creditor, and this antecedent retention of possession did in fact deceive him. "The retention of the possession of land with the exercise of unequivocal acts of ownership over it is a badge of fraud, for it is not in the usual course of business, and indicates a secret trust for the debtor." Again, under the circumstances of this case it devolved upon the plaintiff to prove the consideration. That this sale was a *bona fide* transfer for the consideration expressed in the instrument is alleged in the bill and denied in the answer. The proof shows retention by vendor of possession and acts of ownership. Under these circumstances the burden of proof was upon the plaintiff to show payment of the consideration. This he did not even attempt to do. Callan vs. Statham, 23 How., 477.

We think Nixon in this case acted in good faith and paid value, but the difficulty here is that A., D. & Co. had no title to convey to him, and he got none through their act. The paper purporting to convey the land was not under seal and was not effective to pass the title. It was void under our statute. Hart vs. Bostwick, 14 Fla., 162; Sicards Lessee vs. Davis, 6 Pet., 136; Clark *et al.* vs. Graham, 6 Wheat., 577.

It insisted, however, that even if the paper from A., D. & Co. was not effective to vest any estate or title in them, still that Nixon being present and silent at the time of the execution of the deed from A., D. & Co. to Neal was estopped from denying that the title was in them, that the title was thus good as against him, and that such estoppel would operate against his then creditors subsequently obtaining judgments, and now seeking a sale of the land to satisfy their debts.

The estoppel here insisted upon is an equitable estoppel as contradistinguished from an estoppel by record or deed, and as the existence or non-existence of such an estoppel is determined by a very slight variation in the facts in any given case we think it proper to repeat the general facts established so far as they have a bearing upon the subject in order to an intelligent determination of the question. The bill alleges that Nixon was the agent of A., D. & Co. This is denied by the answer, and the proof, so far as it has reference to this fact, is that Neal dealt with Nixon not as the agent of any one. Neal purchased the property of Nixon, paying him 100,000 oranges. Neal in giving the history of the transaction states in one place that he was told by Capt. Whitesides that Nixon did not own the place, and that it belonged to A., D. & Co. In another place he states that he received a letter a few days before he went to Apalachicola with Nixon in the year 1868, and that this letter was the first intimation he had of any claim upon the land by A., D. & Co.; that when he reached Apalachicola Beale, one of the firm of A., D. & Co., told him the same thing; that he returned home and sent his son William to Apalachicola, and about two days thereafter he received a letter from John Atkins stating that the firm owned the land; that he spoke of this letter to Ivey Gregory; that he exhibited the letter to Nixon, and requested him to go to Apalachicola to see the firm of Atkins, Dunham & Co.; that they went, and that he (Nixon) and A., D. & Co. made the contract of purchase referred to; that to this contract of purchase Nixon made no objection at the time or since. From the case as stated by Neal himself it thus appears that in all his dealings with Nixon wherever Nixon's voluntary *acts* appear it is upon the basis of title in Nixon, and not in A., D. & Co. Neal bought the land of Nixon and paid for it. His informa-

tion as to title in A., D. & Co. he derived from others. His going to Apalachicola, the time at which he seems to have concluded the title was in A., D. & Co., was upon the representation of Whitesides and Atkins, that the title was in A., D. & Co. It is not proved that Nixon made any such representation. Nixon when he went to Apalachicola did not go of his own accord, but was "requested" to go by Neal. Under these facts can it be said that Nixon, by his silence, occasioned the belief that A., D. & Co. had the title, or that this silence was the inducement to take a title from A., D. & Co.? Nor is there any imputation of concealment upon the part of Nixon. What purported here to be a deed from Nixon to A., D. & Co. was of record in Liberty county, and a few moments' examination would have shown Neal that there was no deed, and that the title was still in Nixon. Is an estoppel to operate to cure the result of such extraordinary laches and negligence? Every circumstance existed here to cause Neal to look to the title. Nixon had dealt with him on the basis of ownership, and when Neal had paid him the purchase money another party writes that he and not Nixon was the owner of the property. Is it not a most extraordinary degree of neglect upon the part of Neal under these circumstances not to examine records easily accessible?

To the extent that acts in pais are held to estop the real owner of land to assert a title, or to in effect transfer the title, to that extent is the statute of frauds modified and rendered inoperative, as that statute requires a writing to create an interest in real estate of the character sought to be established by estoppel in this case. While some of the cases adhere to the strict rule and will not permit such operation of an estoppel, still the general rule is "that every one who encourages, or even stands by and sanctions, the acquisition of land by another will not only be estopped

from invalidating the interest thus acquired by the subsequent assertion of any title which he held with full knowledge at the time, but will be compelled to make a conveyance to the purchaser." This is a statement of the general rule, but its exceptions and what constitutes encouraging and standing by and sanctioning is to be ascertained from the particular circumstances covering the subject matter of each case. In 2 Smith Leading Cases, 661, it is stated that no estoppel can spring from silence or acquiescence unless there are some special circumstances which make it a duty to speak, and the maxim of the law that illustrates the doctrine is " that he who is silent when conscience requires him to speak shall be debarred from speaking when conscience requires him to be silent." Among the requirements to give effective operation to an equitable estoppel of this character is acquaintance with his title upon the part of the party sought to be estopped, and that for the reason that it would be the grossest injustice to construe ignorance or misapprehension of the true nature or existence of a right into a forfeiture of the power to enforce it. Tilgham vs. West, 8 Iredell, 83 ; Royston vs. Howell, 15 Ala., 309.

Again, it should also be shown that the conduct of the party sought to be estopped did in fact affect the action of the purchaser ; that it was to some extent the motive and inducement for his action. Brewer vs. Brewer, 19 Ala., 431 ; Morton vs. Hodgdon, 32 Maine, 327 ; The Cambridge Institution vs. Littlefield, 6 Cush., 216 ; Watkins vs. Peck, 13 N. H., 360 ; Otis vs. Sill, 8 Barb., 102 ; Darlington's Appropriation, 1 Harris, 430. It is also true that when the actual state of the title can be readily ascertained by reference to the record, and the purchaser neglects to avail himself of the information which a simple examination of the record affords, silence unaccompanied by fraud will not operate as a peremptory estoppel. Bigelow vs. Topliff, 25

Vermont, 273; Carter vs. Champion, 8 Conn., 554; Gray vs. Bartlett, 20 Pick., 186.

In this case not only did Neal have this means of information readily at hand, but the circumstances were of such character as to specially induce him to examine the records of the county. He had purchased from Nixon, who claimed title, and before the promised deed was executed he was informed by Whitesides and Atkins that Nixon did not have the title, and that A., D. & Co. did. He did not examine the record, nor did he even ask A., D. & Co. to show their title. His failure to ascertain the true state of the paper title was his own fault, and he cannot resort to an estoppel based upon silence to save him from the result of his own extraordinary negligence and laches.

Again. We do not think a *bona fide* purchaser for value without notice from a fraudulent grantee (admitting for the sake of the argument the deed here from N. to A., D. & Co. to be good) can, through the operation of an estoppel resulting from the silence of a fraudulent grantor, acquire as against the creditor the title of the fraudulent grantor. The rule protecting the *bona fide* purchaser from the fraudulent grantee against the assault of the creditor is based upon the fact that the deed though fraudulent as to the creditor is good between the parties. The estate is thus traced. It is in this way the title gets in the fraudulent grantee. The deed is not absolutely void, and it becomes effective when the fraudulent grantee transfers to the *bona fide* purchaser for value without notice. The effect here of the operation of the estoppel would be to protect such purchaser by the mere act of the fraudulent grantor without the existence of any intervening estate, and would thus in effect render the fraudulent deed of the grantor operative to pass a title good against creditors without the intervention of any other estate, which cannot be. Again, even if

the deed here from N. to A., D. & Co. was *bona fide* and regular and for value it is not good against creditors under our statute, unless it is a *deed* recorded. The effect of an estoppel here we thus see would be to suspend the operation of two statutes controlling the subject, even if the instrument was a deed, the execution of which was in all respects formal, and this under the circumstances before stated.

Such portion of the evidence in this case as the statute (Chap. 1983, Laws,) prohibits as being in reference to a transaction or communication by Nixon with the witness, a party and interested person, is not considered in reaching our conclusions. They are based upon the admissions of the bill and the other legal evidence. The statute operates to exclude such testimony. Tunno and Jessup & Co. vs. Robert, 16 Fla., 750 ; Sanderson's Administrators vs. Sanderson, 17 Fla., 864 ; Price *et ux.* vs. Hicks, 14 Fla., 586.

So much of the decree in this case as dismisses the bill without prejudice to the plaintiff's filing " a new bill setting up title under purchase directly from Nixon is reversed." In all other respects it is affirmed, and the case will be remanded with directions to enter a decree dismissing the bill generally at the cost of the appellant upon notice to the plaintiff in the bill or his attorneys.