# WILSON CYPRESS COMPANY *v.* DEL POZO Y MARCOS.

## APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE FIFTH CIRCUIT.

No. 135. Argued January 19, 1915.—Decided March 15, 1915.

Although the jurisdiction of the Federal court may have been invoked solely on account of diverse citizenship, if the object of the suit is to quiet title to a grant of the former sovereign, depending for its completeness on a treaty and on laws of the United States and acts of Federal officers thereunder, this court has jurisdiction to review the judgment of the Circuit Court of Appeals.

Although the amount of land patented to the grantee of a former sovereign may have exceeded the amount confirmed by the act of

Congress and have been predicated upon a survey and limitation to the amount confirmed, the patentee has a taxable interest in the land that can be reached for proper taxation by the State.

Where the lower courts erroneously sustained complainant's contention that the lands involved were not taxable because never segregated from the public domain, and therefore did not pass upon the other contentions also urged by complainant as sufficient to sustain the title and which involved questions of local law and the weighing of conflicting evidence, this court will not on finding that the lower courts erred on the question of taxability finally pass on the other questions, but will reverse the decree and remand the case to the lower court for further proceedings in accordance with the opinion.

202 Fed. Rep. 742, reversed.

SUIT to quiet title brought in the Circuit Court for the Southern District of Florida by appellees, whom we shall call throughout complainants and the appellant defendant.

The bill alleges that the complainants are the heirs at law of Miguel Marcos, a lieutenant in the Spanish Army; that he was granted by the lawful authorities of the King of Spain on the eighteenth of October, 1815, 5,500 acres of land in the then Province of East Florida, on two banks of a creek which empties into the St. John's river about two miles north of Long Lake; that the grant was confirmed to his widow, Teresa Rodriguez, in her own right and for and on behalf of her children by the United States to the extent of a league square; that the grant was an inchoate right to said tract, under the laws of Spain called a first title or permit to occupy the land and, after occupancy and proof thereof, to secure a complete or royal title, but before such title issued Spain ceded East Florida to the United States, who, by the eighth article of the treaty between the United States and Spain, occupied the position of Spain with regard to this and like grants of land and were pledged to confirm title thereto; that the lands were neither surveyed nor segregated from the public domain during the sovereignty of Spain; that the same were wild and uncultivated, were never in the actual occu-

pancy of the grantee or of his widow and children and the title thereto at the time of the cession of the Floridas passed to the United States, subject to the equitable claim of the complainants.

The succession of complainants to the original grant is traced by the bill and it is alleged that soon after the cession of the Floridas to the United States, Teresa Rodriguez, applied to the board of land commissioners appointed to examine and report on claims to lands in East Florida for the confirmation of the grant and it was reported by the board to Congress as a valid grant and its confirmation recommended. That thereafter Congress, by an act approved May 23, 1828, c. 70, 4 Stat. 284, confirmed it to the extent of a league square, to be located within the limits of the original claim and bounded by sectional lines, and to be in quantities of not less than one section. That under the sixth section of the act of Congress confirmation of the grant was required to be accepted as a final settlement of the claim or the claim to be brought before the judge of the Superior Court for the district of East Florida within one year from the passage of the act; that the latter proceeding was not had and that by the act of Congress the title to the land was confirmed to the extent of one league, to be located within the bounds of the original grant.

That it was held by the judicial and executive branches of the Government that a league square was 4,438.68 acres. That by the laws then in force in the Territory of Florida it was the duty of the Surveyor General of the Territory to make the survey of the lands confirmed to complainants' ancestor and make certificate thereof and file the same in the land office of the United States in said Territory. That among the acts of Congress extending to said Territory was the act of March 3, 1807, by the terms of which it was made unlawful to take possession of, survey or cause to be surveyed or settle upon any lands ceded or secured to the United States by any treaty with a foreign

nation, or any land, claim to which had not been recognized and confirmed by the United States, under a penalty of forfeiture of the right, title and claim to such lands. That the ancestors of complainants were residing in Cuba on the twenty-third of May, 1828, and they and their descendants have since that date resided there and none of them have resided or been in the United States since the passage of the act of May 23, 1828, confirming the grant to the extent of a league square. That the United States never surveyed and segregated the lands as confirmed, as held by the Land Department of the United States, and the confirmees had no power to cause such survey to be made. That the lands embraced in the grant were surveyed as public lands by the United States in 1847, and such survey was approved May 15, 1848. A certified copy of the official plat of survey is attached to the bill and it is alleged that the lands were held by the Land Department of the United States to be public lands and were so treated from 1831 to February 12, 1894, upon which date the grant described in the bill was by the Land Department of the United States declared to be a valid, confirmed private grant to Teresa Rodriguez and ordered to be patented, and thereafter it was so patented to her, her heirs, assigns and legal representatives, and the lands described as section 37, township 19, south of range 28, and section 41, township 19, south of range 29, according to the plat of the public surveys made by the United States, and for the aggregate of 5,486.46 acres. That until such recognition of the title of complainants and those under whom they claim from and after May 23, 1828, complainants were excluded from the possession of the lands, and the United States had both the legal title and possession and right of possession of them and any occupancy of them by any other than the United States was a mere trespass; that before February 12, 1894, complainants and those under whom they take title were not able to take possession of

the lands because the United States claimed the entire grant as public lands.

The bill then sets out the asserted title of the defendant to have been derived from a sale to one John Starke on July 5, 1852, by the sheriff and ex-officio tax collector of Orange County, Florida, based upon a pretended execution for certain unpaid taxes alleged to have been assessed "upon the 'lands supposed to belong to Teresa Rodriguez,'" and the said sheriff attempted to deed to said Starke "'all the right, title and interest of Teresa Rodriguez and others'" in and to said tracts of land. That the said sale and deed are absolutely null and void because (1) it was alleged to be an assessment upon the single tract containing 5,480 acres and to be payable for the years 1845 to 1851, both inclusive, during which time the legal title and possession were in the United States; that the lands were expressly exempt from taxation by the statute of the State of Florida during those years, which declared that the act for the assessment and collection of taxes should not be construed to embrace lands belonging to the United States.   (2) That the amount of taxes assessed was in excess of what could have been lawfully levied.   (3) That proper notice of the sale was not given; (4) nor was the land sold in the parcels required.   (5) That the deed was not properly executed, it having no subscribing witness and its record being wholly unauthorized.

Like invalidity is asserted against the tax and sale of the land for the years 1867, 1868 and 1869 assessed to John Starke, and conveyed by the sheriff to one William Mills. In addition it is alleged that no statute in Florida authorized a tax collector to make a tax deed upon a sale for the non-payment of taxes, such being the duty of the county clerk of the county wherein lay the lands. That the assessment and tax sale and deed to William Mills were made in execution of a conspiracy by him and Robert

C. Patten and one George C. Powell to deprive complainants of their title; that Mills never took possession of the lands but attempted to convey them to Powell; that Powell entered only upon section 9 (a part of section 37, above named) of said township 19, range 28, and made some improvements to complainants unknown and cut some timber thereon. That he exercised no other acts of ownership and those were continued but for a short time and "were not uninterrupted by continued occupancy for seven years" and were subsequently abandoned by him; that the possession was not sufficient either in character or duration to enable him to claim the benefit of the statute of limitations against any action brought by complainants; that complainants were precluded from bringing any action because the lands were held and claimed adversely by the United States and held to be public lands of the United States. Other tax assessments and sales are alleged and conveyance and title traced through them to the defendant, the Wilson Cypress Company, but the latter has never had such possession as would bar a right of entry by complainants. It is alleged that complainants tried to get a recognition of their title but only succeeded on June 18, 1894.

There are many other allegations which assert the validity of complainants' title and the invalidity of that of defendant, and that on June 26, 1895, the United States quit-claimed and patented to the legal representatives of Teresa Rodriguez the lands granted to Marcos and which had been surveyed as section 37, township 19, range 28, and section 41 of the same township, range 29, containing 5,486.46 acres. That the patent was duly recorded in the records of the United States and in the public records of Lake County, Florida, and the grantor of defendant and defendant had knowledge of it when the conveyance was made. That after the issue of the patent complainants were for the first time entitled to the possession of the

lands and from such date they became subject to taxation, and thereafter complainants sent their agent to Florida and took possession of the lands and have continued ever since to claim and have exercised acts of ownership over them.

It is alleged that the tax deeds referred to in the bill are fair upon their faces and are clouds upon the title of complainants and hinder them in the full enjoyment of their property and should be canceled and discharged from the public records.

It is further alleged that defendant will aver that no patent was necessary to evidence complainants' title and that by the confirmation of the grant title vested in the grantee and his legal representatives, but complainants allege that under the facts set out the United States did not relinquish title until the twenty-sixth of June, 1895, and before the approval of the survey of the lands granted the legal title was in the United States and the claim of complainants attached to no particular land.

There are other allegations of what the defendant will aver as to possession and right and it is then alleged that there never has been such possession by defendant as would establish an adverse holding.

An injunction was prayed against the defendant enjoining it and its officers from exercising acts of ownership over the land or from disturbing the possession of complainants; that the tax deeds and other deeds set out in the bill be held to have been executed without authority of law and that they be annulled and canceled.

The answer is as voluminous as the bill. It negatives many of the allegations of the bill either by denials or opposing allegations and asserts that the grant from Spain and its confirmation by the United States passed a complete title to the land. It also asserts the validity of the title acquired through the tax deed; alleges the insufficiency of the bill in equity; sets up the statute of limita-

tions, and charges laches and estoppel, the complainants in the bill having permitted large expenditures for care and improvement of the property by defendant. And it also puts in issue the relationship of complainants to Marcos and Teresa Rodriguez and denies that they are entitled to maintain the bill.

Upon proof being submitted, and after hearing, it was decreed that complainants were descendants and heirs at law of Teresa Rodriguez, the grantee in the patent of the United States hereinbefore referred to, were entitled to "an undivided interest in and to the lands" in controversy (which were specifically described) "and for themselves and as representatives of all persons claiming title to said lands through the said Teresa Rodriguez, her heirs and legal representatives," were "entitled to maintain this bill to remove cloud from" the lands.

The decree recited the tax deeds and the lands which they purported to convey, and adjudged that the deeds, having been based upon assessments made prior to the issue of the patent and while the validity of the grant to Marcos was denied by the United States, were absolutely null and void and a cloud upon the title of Teresa Rodriguez and her legal representatives and heirs at law and set aside.

And it was further decreed that defendant had no title or interest in the patented lands and that it and all persons claiming under it were enjoined from setting up any title under the tax deeds or from entering upon or holding possession of the lands or any part thereof.

The decree was affirmed by the Circuit Court of Appeals. The opinion of the court was as follows (202 Fed. Rep. 742): "The lands in controversy were not segregated from the public domain, and the title thereto remained in the United States until the issuance of the patent; therefore they were not taxable by the State of

Florida at the several times they were listed for taxes and sold for nonpayment thereof."

*Mr. John C. Cooper* for appellant.

*Mr. William W. Dewhurst,* with whom *Mr. Joseph H. Jones* and *Mr. John C. Jones* were on the brief, for appellees.

MR. JUSTICE MCKENNA, after stating the case as above, delivered the opinion of the court.

The tedious volume and prolixity of the bill are directed to establish that Miguel Marcos, the ancestor of complainants, received a grant from the Spanish authorities, not becoming complete in his descendants, the complainants, until June 18, 1894, and until such time the lands which the grant embraced were not subject to state taxation and that, therefore, the deeds issued to defendant in consequence of such taxation are void. And of this view were the two lower courts, the one in consequence entering a decree to quiet the title of complainants against the deeds, and the other affirming such decree. This appeal was then taken.

A motion is made to dismiss the appeal on the ground that the jurisdiction of the court was invoked solely because the complainants were aliens and the defendant was a citizen of the United States. This is a narrow view of the bill. It seeks to quiet the title of complainants to a tract of land commencing in a grant from Spain, depending for its completeness upon the treaty with Spain and laws of the United States, and the action under those laws by the officers of the Land Department of the United States, and it especially relies on those laws to defeat defendant's claim of title and to have it removed as a cloud upon that asserted by complainants. Indeed, there

is scarcely a contention of complainants which does not
primarily or ultimately depend upon the laws of the United
States. The motion to dismiss is, therefore, denied.

The first proposition on the merits is the character of
the grant from Spain to Marcos. Complainants contend,
as we have seen, that it was an inchoate or incomplete
grant. The defendant, *per contra*, insists that it was
confirmed as a complete and perfect title by the force
and effect of the treaty between the United States and
Spain.

It is well here to repeat some of the allegations of the
bill that their scope and effect may be understood. It
alleges the action of the Board of Land Commissioners
reporting the grant to Congress for confirmation and the
several acts of Congress relating thereto, especially the
act of May 23, 1828, c. 70, 4 Stat. 284. That the grant
was under the laws of Spain, "called a first title or permit
to occupy the land and, after occupancy and proof thereof,
to secure a complete or Royal title." It is, however, fur-
ther averred that before a perfect title could be obtained
Florida was ceded to the United States, who by the eighth
article of the treaty pledged itself to confirm the title;
and that to secure such confirmation Teresa Rodriguez,
widow of Marcos, applied to the Board of Land Com-
missioners and the Board reported the grant to Congress
as valid and recommended its confirmation, and that
thereafter Congress, by the act of May 23, 1828, con-
firmed it to the extent of a league square, to be located
within the limits of the original claim and bounded by
sectional lines and to be "in quantities of not less than
one section."

This apparently left nothing to be done but to segre-
gate the land by a survey, but the bill alleges that the
grantees were required to accept the confirmation as a
final settlement or bring their claim before the judge
of the Superior Court for the district of East Florida.

This was not done, it is alleged, but it is again alleged that the title was confirmed to the extent of one league square, to be located within the bounds of the original grant.

Notwithstanding they had a grant confirmed to them of a possible league square, possession was not taken, it is alleged, because under the act of March 3, 1807, to have taken possession would have forfeited their right, and that it was not until February 12, 1894, when their title was recognized by the Land Department of the United States, that they were able to assert ownership of the land. In other words, that until such date the United States did not relinquish its title and possession of the lands; that the obligation to confirm grants of lands assumed by the United States by the treaty with Spain was political in character, and to be discharged as the United States deemed expedient, and as to the grant to Marcos the United States retained possession and title thereto from March 23, 1828, to the issuance of the patent; that before the approval of the survey of the lands granted to Marcos the legal title was in the United States and the claim of complainants attached to no particular lands.

It will be observed, therefore, that the basis of the contention of complainants is that their ancestor, Marcos, received an inchoate title to an unspecified tract of land "two miles north of Long Lake on both banks of a creek emptying into the St. John's river, if this tract of land could be identified," and because it was not identified, even by the survey approved by the Land Department, counsel say that "the title to the lands in controversy, therefore, whether Marcos held a first cession or a royal title, is held under the United States and not under Spain."

This, however, we assume, is but another way of stating that complainants had no interest in the land that they could assert or that the State of Florida could tax until the United States issued its patent, and yet the United

States has done no more than recognize the title derived from Spain and as derived from Spain. It is true there were at first some doubts and hesitation, but ultimately the recognition was complete, following and in pursuance of the confirmation of the Marcos grant by the act of May 23, 1828, and upon a survey made as early as 1851. At whose instance the survey was made does not appear. Section 1 of the act of May 23, 1828, requires the land confirmed by it "to be located by the claimants, or their agents, within the limits of such claims or surveys . . . which location shall be made within the bounds of the original grant, in quantities of not less than one section, and to be bounded by sectional lines." Some uncertainty arises from § 2. It provides that no more than the number of acres contained in a league square shall be confirmed within the bounds of any one grant; and no confirmation shall be effectual until a full and final release of all claim to the residue contained in the grant. And something is made of the provision by complainants to refute the contention of defendant that the act was an absolute confirmation of the grant, but it certainly cannot be contended that it took all power from the act and left the grant without any foundation whatever; and we are brought back to the consideration that a valuable property was confirmed to complainants which only needed a survey to identify it, and, when surveyed, was segregated from the public domain and subject to the taxing jurisdiction of the State. The survey was made, we have seen, in 1851 under contract with Benjamin A. Putnam, surveyor general. The act of June 28, 1848, c. 83, 9 Stat. 242, directed that surveys be made as soon as practicable of the private claims or grants which had been duly confirmed situated in the State of Florida. It is probable that the survey was made in obedience to this direction. The field notes of the survey and the official plat thereof were approved by the surveyor general June 20, 1851,

and the patent recites that the description of the land therein given is taken "from the approved field notes of the survey thereof as executed by M. A. Williams, a deputy surveyor, in the month of January, 1851, under his contract with Benjamin A. Putnam, surveyor general of Florida, of the 19th of October, 1850." Indeed, the patent rests alone on the survey as a description and segregation of the land, the grant of which was confirmed by the act of Congress of May 23, 1828, as claim No. 22, recommended for confirmation December 16, 1825, by the Board of Commissioners in pursuance of the act of Congress of March 3, 1823.

All the conditions of a taxable property existed, unless there be merit in the contention of the complainants that the survey of 1851, upon which the patent was predicated, was of no effect unless and until approved by the Commissioner of the General Land Office. This contention has been earnestly pressed upon our attention, but is untenable. It has no support in any statute or regulation that was in force at the time. The confirmatory act of May 23, 1828, and the act of June 28, 1848, were both silent upon the subject, and in the absence of some applicable special provision the general statute relating to public surveys was controlling. The general statute was then embraced in the act of May 18, 1796, c. 29, 1 Stat. 464, and its amendments, and was afterwards incorporated in Chapters 1 and 9 of Title 32 of the Revised Statutes, more especially §§ 2223 and 2395. It expressly dealt with the survey of private land claims as well as of public lands, but contained no requirement that the survey of either be approved by the Commissioner. This is apparent upon an inspection of the statute and is shown by two decisions of this court, one relating to the survey of a private land claim resting upon a confirmed Mexican grant and the other to the survey of public lands. *Frasher* v. *O'Connor*, 115 U. S. 102, 115; *Tubbs* v. *Wilhoit*, 138 U. S.

134, 142–144. In both cases the court approvingly referred to a decision of the Secretary of the Interior, in the latter case quoting the Secretary of the Interior as follows: "There is nothing in the act of 1796, or in the subsequent acts, which requires the approval of the commissioner of the general land office before said survey becomes final and the plats authoritative. Such a theory is not only contrary to the letter and spirit of the various acts providing for the survey of the public lands, but is contrary to the uniform practice of this department. There can be no doubt but that under the act of July 4, 1836, reorganizing the general land office, the commissioner has general supervision over all surveys, and that authority is exercised whenever error or fraud is alleged on the part of the surveyor general. But when the survey is correct, it becomes final and effective when the plat is filed in the local office by that officer." And it was added: "This practice was changed by the Land Department in April, 1879, and communicated in its instructions to surveyors general on the 17th of that month. It was not until after such instructions that the duplicate plats filed in the local land offices were required to be previously approved by the commissioner of the general land office." It follows that the land granted and confirmed was fully identified by the survey of 1851, the field notes and plat of which are shown in the record. Of the office of the patent it is enough to repeat what was said in *Beard* v. *Federy*, 3 Wall. 478, 491: "In the first place, the patent is a deed of the United States. As a deed, its operation is that of a quit-claim, or rather of a conveyance of such interest as the United States possessed in the land, and it takes effect by relation at the time when proceedings were instituted by the filing of the petition before the Board of Land Commissioners. In the second place, the patent is a record of the action of the government upon the title of the claimant as it existed upon the acquisition of the

country." In *Boquillas Cattle Co.* v. *Curtis*, 213 U. S. 339, 344, such a patent was described "as a confirmation in a strict sense." See also § 3 of the act of May 23, 1828.

It will be observed, from the allegations of the bill, which we have taken the trouble to repeat, that the foundation of the title of complainants is a grant from Spain, which was reported as valid by the Board of Commissioners of the United States, recommended by such Board for confirmation and confirmed by the Act of Congress of May 23, 1828, to the extent of one league, "to be located by the claimants"; that subsequently (1851) a survey was made under a contract of the Surveyor General of Florida which has been accepted as the segregation of the land and set forth in the patent, and that the sole basis of the patent is the title so derived and confirmed.

It is true, as we have stated, that the Commissioner of the Land Office in 1890 refused to issue a patent, deciding that the claim had been "surveyed in Tp. 19, S., Rs. 28 and 29 E., for 5,426.82 acres." The grounds of his decision were these: the claim was before Congress when the act of February 8, 1827, c. 9, 4 Stat. 202, was passed but that that act only confirmed those claims which were under the quantity of 3500 acres and provided "for the survey of this [Teresa Rodriguez] and other claims, exceeding in area 3500 acres." Referring to the act of May 23, 1828, it was said that by its sixth section those holding claims like that under consideration might secure a confirmation thereof by prosecuting the same in the courts. It was further said that "patents in this class of cases are based on some confirmatory act of Congress or upon a confirmation of some tribunal, created by Congress for that purpose." Considering that there was no confirmation by Congress and no decision of any tribunal created by Congress, the Commissioner declined "to patent the same for the want of proper evidence upon which to base such action." A review of the decision and

action was invoked and the attention of the Commissioner was directed to § 1 of the act of May 23, 1828, and a confirmation claimed thereunder on the ground "that its survey contains a less quantity than a league square." To this the Commissioner answered that the "grant was made by Spanish authority and must be understood to mean a grant of 5,500 acres according to the measurement used by Spain in measuring grants of this character. . . . A 'league square' by this measurement contains 25,000,000 varas, or 4438.68 English acres.

"The Rodriguez claim, as before stated, has been surveyed so as to embrace 5,426.82 acres, or 988.14 acres in excess of a Spanish 'league square.'

"Said act of 1828 provided a method by which claims not confirmed by its first section might be confirmed by its second section. This second section required the claimants, who accepted its provisions, to release the land in excess of a league square.

"No release of the 988.14 acres herein referred to is found on file here. . . .

"The Rodriguez claim not having been confirmed, I must decline to take up the same with a view to the issuance of a patent therefor."

An appeal was taken to the Secretary of the Interior and a decision rendered by him February 12, 1894. The Secretary stated that the lands within the limits of the grant have been surveyed in Twp. 19 S., Rs. 28 and 29 E., in Florida, that it was presented to the Board of Land Commissioners in Florida for 5,500 acres, and contained according to said survey 5,486.46 acres. The opinion then recites the history of the grant and the steps which had been taken for its confirmation, defined a league square to contain 6,002.50 acres of land and that in accordance therewith the grant was petitioned and allowed for 5500 acres.

In answer to the view expressed by the Commissioner

that a Spanish league was meant, it was said that the conclusion was "at variance with and repugnant to every fact and circumstance in the history of Spanish grants in the provinces mentioned [Louisiana and the Floridas] and in the legislation of Congress in relation thereto." It was hence held that a "league square" of land as understood by Congress in the act of May 23, 1828, meant a tract of land containing 6,002.50 acres and that it followed, therefore, that the Rodriguez claim "contained, as shown by the survey, less than a league square and is confirmed by the first section of the act of May 23, 1828, *supra.*" The decision of the Commissioner was reversed and that officer was "directed to patent said claim in accordance with the survey thereof."

Both the Commissioner and the Secretary proceeded upon the theory that the survey as approved by the surveyor general in 1851 was effective, if the grant was confirmed by the first section of the act of 1828.

We have been at pains to cite at length from these decisions to show how little stood in the way of the complete assurance of complainants' title and that its foundation was the direct confirmation of it by the act of May 23, 1828, and that the grant needed definition only by a survey, which was made as we have seen, in 1851. This survey was referred to by counsel for complainants, by the Commissioners of the Land Office and the Secretary of the Interior and in the patent, it being made the foundation of the latter. The case, therefore, becomes in principle like *Wisconsin Railroad Company* v. *Price County*, 133 U. S. 496; *Witherspoon* v. *Duncan*, 4 Wall. 210; *Northern Pacific R. R.* v. *Patterson*, 154 U. S. 130; *Maish* v. *Arizona*, 164 U. S. 599.

This disposes of the primary proposition in the case, to-wit, that complainants had a taxable interest in the granted lands; but assuming the contrary, defendant yet insists that complainants are not entitled to the relief

which they pray. There are other contentions as well, urged respectively by defendant and complainants, upon which the courts below did not pass, and we are brought to consider what disposition should be made of the case in view of such contentions.

The first of the contentions relates to the title of defendant, which has its foundation in a sale for taxes by the State of Florida alleged to have been assessed for the years 1845 to 1851, both included, and a deed from the sheriff to one John Starke (1852), and subsequently an assessment to the latter for taxes and a sale for his delinquency, title ultimately reaching defendant through mesne conveyances.

The validity of the tax deeds is attacked by complainants, they asserting that the deeds were not preceded by a valid assessment, nor indeed any assessment, nor executed in accordance with the laws of the State, nor (as to some of them) by the proper officer. On these contentions, as we have said, the courts below expressed no opinion. Their solution depends upon testimony somewhat voluminous and not very satisfactory, of which there is no analysis either by the master or by the trial court or by the Court of Appeals.

The statute of the State, it is agreed, in 1845 to 1851 required the assessors of the counties "to take down and assess the taxable property in his county" and on or before the first day of March in each year "to make out three books in alphabetical order of all the taxable property in his county, one of which books he shall forward to the comptroller of the treasury, one other of said books he shall deliver to the sheriff of his said county, and the other book he shall deliver to the board of county commissioners of his said county."

The act provided that in default of an assessment by the assessors the sheriffs of the counties should assess and list the taxes for their respective counties and to proceed

to have the property therein assessed in such manner as the assessors were required to perform such duty.

The chief clerk of the comptroller's office, upon being called as a witness by complainants, testified that he found duplicate tax rolls of 1845 to 1851, inclusive, except for the year 1847, which he could not find. To his certain knowledge the rolls had been in the office for thirty years. The rolls were certified by the assessor as correct so far as his knowledge extended. Some of the rolls were not endorsed as filed. The witness testified that he could add nothing to the identity of the rolls other than the certificates and that he could not determine whether the roll of 1845 was made in accordance with law or not. And further that the "book" (roll) was alphabetically arranged to the extent of the first letter in the surnames and that the land was designated according to its quality as first, second or third rate and assessed respectively at three-fourths, one-half and one-quarter of a cent an acre, but the number of acres was not given nor a description of the land.

To the question whether there was property assessed to Teresa Rodriguez he answered, "So far as the question of whether any lands are entered there opposite the name of Teresa Rodriguez is concerned, I will say that I am unable to find that particular name. But I will state further that it is impossible for me to declare that the property of Teresa Rodriguez is not assessed, for the reason that property is entered on this book, following after the word 'same' in a number of instances, and for that reason I don't know who 'same' was intended to be. In a number of instances 'same' appears there, and 'ditto.' In making the ditto they used two ditto marks. Wherever the word 'same' appears a name immediately precedes it, but where the ditto marks (or dots, the intention of which I do not know) just precede those, no name appears."

There is other testimony equally confusing as to the

roll of 1846. He testified that some portions of it were rotted out. But how far this affected the roll does not clearly appear. And as to the roll of 1848 he testified that it was so mutilated and torn that he was unable to arrive at any conclusion as to how the lands were assessed therein; and further that he was unable to give the names that were entered between the letter P and the letter S, for the reason that by decay they had become so dim and stained that he was unable to make them out. The testimony was clearer as to the roll of 1849 and the name of Teresa Rodriguez did not appear thereon. The witness testified that Teresa Rodriguez' name did not appear on the roll of 1850, but he was not able to say whether her property was attempted to be assessed or not; that he was only prepared to say that her name was not on the roll. The certificate to this roll stated "that the foregoing assessment of State taxes corresponds exactly with that contained in the book filed by me in the office of the Judge Probate, and were retained by me, John Simpson, tax assessor and collector." It may be observed in passing that John Simpson, as sheriff and tax collector, levied upon and sold to John Starke lands "supposed to belong to Teresa Rodriguez." There is some presumption that he proceeded upon a knowledge of the records and the requirements of the law. We have seen, the statute required the sheriffs to make assessments if the assessors failed to make them.

On cross-examination the clerk of the comptroller's office repeated that he was unable to determine if Teresa Rodriguez' lands had been assessed, that "in the absence of specific descriptions it would be impossible to determine a question of that nature."

Testimony was offered on the part of defendant to the effect that the court house of Orange County, where the lands are situated, was destroyed by fire in 1868 or 1869 and one only of the books of record was saved, it not being in the court house at the time of the fire. It was a mis-

cellaneous record—separate volumes of deeds, mortgages
and miscellaneous matter not then being required.  There
was nothing in its index which covered tax sales or tax
assessments.

It will-be observed, therefore, the testimony as to assess-
ments is somewhat uncertain and confused and that the
courts below made no attempt to analyze or explain it,
their view of the case making it unnecessary.

There are other contentions equally dependent upon
testimony.  For instance, defendant asserts that the record
shows that complainants were guilty of laches, more than
twelve years having elapsed from the date of the patent to
the filing of the bill, and that besides the suit is barred by
the statute of limitations.  And, further, that one of the
parties in the tax title took possession immediately upon
his purchase of the lands in 1872 and remained in posses-
sion until 1882, cultivated a portion of the lands, cut tim-
ber therefrom and exercised other acts of ownership.  That
his successor in title succeeded also to the possession, hold-
ing it until his sale in 1884 to the Florida Colonization
Company, the grantor of the defendant, from which, in
1890, defendant received the title and possession.

It is contended that during all such time complainants
neither paid nor offered to pay taxes, that the other parties
did, the defendant successively from 1890, and that it also
made other expenditures; that complainant asserted no
claim to the lands against it and let twelve years elapse
after patent was issued before bringing this suit.

The courts below rejected these contentions.  The trial
court seemed to have arrived at its conclusion by disre-
garding the possession, whatever it was, which was held
by defendant's predecessors in the title or its possession
prior to the issue of the patent.  "It makes no difference,"
the court said, "what the occupation or possession may
have been while the title to the property was in the United
States, and it is not considered that the possession during

such time can be resorted to to determine whether or not the property was, after the issue of the patent, in the actual possession of the defendant through its agent sufficient to legally bar a right to maintain a bill to remove cloud from title."

We think the learned court erred in this. The continuity of possession was a factor to be considered,—we do not say determinative. The evidence of numerous witnesses seems to conflict upon the character and extent of such possession, an analysis of which can better be made in the first instance by the master or the trial court than by an appellate court.

There are other contentions, besides, which were not passed upon. The validity of the deed from the sheriff to Starke is questioned because, it is asserted, it has neither subscribing witnesses nor evidence of having been acknowledged, and, it is contended, under the laws of Florida a certified copy of a deed is not admissible in evidence as proof of the execution or contents of the original, if the record has not been made upon the evidence of execution required by the statute, citing *Kendrick* v. *Latham*, 25 Florida, 819. Indeed, the contention is even that a deed without subscribing witnesses does not convey the land described for a term of more than two years, citing *Hart* v. *Bostwick*, 14 Florida, 162, 173; *Neal* v. *Gregory*, 19 Florida, 356.

To this defendant opposes the contention that the laws of Florida did not require subscribing witnesses to a deed from a sheriff made in execution of a levy upon the property for the collection of taxes, and that, further, even if so, there was a right to receive a deed from the successor of the sheriff and that, therefore, an equitable title was conveyed to Starke which was subject to taxation and to sale upon his delinquency.

We do not pass upon the contention nor intimate an opinion of the other contentions we have mentioned or

which are presented by the pleadings. We refer to them to show that on account of the view of the courts below on the taxability of the lands they omitted to pass on a number of important issues, some of which require a consideration of testimony, and some—it may be all—an examination of the local laws and decisions, as dependent on such testimony. And, we repeat, a consideration of such testimony should be made in the first instance by the trial court. *Chicago, Milwaukee &c. Ry.* v. *Tompkins,* 176 U. S. 167; *Owensboro* v. *Owensboro Water Works Co.,* 191 U. S. 358.

> *Decree reversed and cause remanded for further proceedings in accordance with this opinion.*