**DRISCOLL et al. v. BURLINGTON–BRISTOL BRIDGE CO. et al.**

Civ. No. 11907.

United States District Court
D. New Jersey.

Feb. 25, 1949.

Russell E. Watson, of New Brunswick, N. J., for plaintiff Alfred E. Driscoll.

Walter D. Van Riper, of Trenton, N. J., for plaintiff Alfred E. Driscoll and pro se.

Pitney, Hardin, Ward & Brennan and William J. Brennan, Jr., all of Newark, N. J.(Donald B. Kipp and William P. Reiss, both of Newark, N. J., of counsel), for defendants Chemical Bank & Trust Co. and B. J. Van Ingen & Co., Inc.

Milton M. & Adrian M. Unger, and Milton M. Unger, all of Newark, N. J., for defendants Sarjem Corporation, Richard C. Nongard, Tuthill Ketcham and Rowland .H. Murray, individually and as partners trading as Ketcham and Nongard, Robert M. Sherritt, Thomas J. Christensen, Irene E. Powell, Paul A. Powell, Mildred P. Meader, Clifford R. Powell, Robert K. Bell, Theodore R. Hanff, Richard W. Parks and Gladys A. Parks.

Robert L. Hood, of Newark, N.J., for defendants Burlington-Bristol Bridge Co., Tacony-Palmyra Bridge Co., Board of Chosen Freeholders of Burlington County, Burlington County Bridge Commission, Daniel Lichtenthal, Fred C. Norcross, Jr., and Howard R. Yocum, individually and as members of the Burlington County Bridge Commission.

FORMAN, District Judge.

A civil action in the form of an "Information and Complaint" was originally filed in the Superior Court of New Jersey, Chancery Division, Burlington County, by Alfred E. Driscoll, Governor of the State of New Jersey, and Walter D. Van Riper, Attorney General of the State of New Jersey (hereinafter referred to as plaintiffs). It was removed to this court on the petition of two of the defendants, Chemical Bank and Trust Company and B. J. Van Ingen & Company, Inc., (referred to herein as petitioners) who rested their claim to the right of removal upon the ground that it is a civil action of which this court has original jurisdiction wherein the matter in controversy exceeds the sum of $3,000 exclusive of interest and costs and arises under the Constitution and laws of the United States and Acts of Congress regulating commerce. Subsequently the following defendants consented to joinder with the latter in their petition for removal: Sarjem Corporation; Richard C. Nongard, Tuthill Ketcham and Rowland H. Murray, individually and as partners trading as Ketcham and Nongard; Robert M. Sherritt; Thomas J. Christensen; Irene E. Powell; Paul A. Powell; Mildred O. Meader; Clifford R. Powell; Robert K. Bell; Theodore R. Hanff; Richard W. Parks; Gladys A. Parks; Burlington-Bristol Bridge Company; Tacony-Palmyra Bridge Company; Burlington County Bridge Commission; Daniel Lichtenthal; Fred C. Norcross, Jr., and Howard R. Yocum, individually and as members of the Burlington County Bridge Commission; and the Board of Chosen Freeholders of the County of Burlington.*

The matter is now before the court on the motion of the plaintiffs to remand the case to the State court.

Because the "frame of reference" in this type of motion is contained within the four corners of the complaint, it is necessary to refer at considerable length to the "Information and Complaint" filed by the plaintiffs in which they allege, among other things, as follows:

That the Tacony Bridge Company was incorporated June 25, 1926 under Chapter 247 of the New Jersey Laws of 1925 entitled "An Act to authorize the formation of companies for the purpose of constructing, maintaining and operating bridges over the Delaware river, and regulating the same," N.J.S.A. 48:5–13 et seq.; that the Burlington Bridge Company was incorporated on March 27, 1928 under the same law;

That the Tacony Bridge Company was authorized by an Act of Congress, Chapter 56, Session II, Jan. 25, 1927, 44 Stat. 1024, to construct a bridge across the Delaware River between Palmyra in the County of Burlington, New Jersey and Tacony, in the City of Philadelphia, Pennsylvania and that it constructed the Tacony-Palmyra Bridge completing it on August 14, 1929 pursuant to the said Act of Congress and the law of the State of New Jersey as aforesaid;

That Burlington Bridge Company, as assignees of Joseph R. Cheeseman and Clifford A. Anderson, who were authorized by an Act of Congress, Chapter 351, Session I, March 21, 1926, 44 Stat. 588, to construct a bridge between the City of Burlington, New Jersey and the City of Bristol, Pennsylvania, completed the Burlington-Bristol Bridge on May 1st, 1931, pursuant to the said Act of Congress and the law of the State of New Jersey;

That the Burlington Bridge Company and the Tacony Bridge Company, pursuant to Section 9 of said Chapter 247 of the New Jersey Laws of 1925, N.J.S.A. 48:5–22 to 24, gave their lawful consents to the State of New Jersey acting in conjunction with any adjoining state or municipality thereof to acquire said bridges subject to the acquisition of the same by the State of New Jersey or by any political subdivision thereof pursuant to the terms and conditions stated in the aforementioned Acts of Congress;

---

* The parties herein listed below will be referred to as follows:
Burlington-Bristol Bridge Company . . . . . . . . . . . . . . . Burlington Bridge Company
Tacony-Palmyra Bridge Company . . . . . . . . . . . . . . . . . Tacony Bridge Company
Board of Chosen Freeholders . . . . . . . . . . . . . . . . . . . Board of Freeholders
Burlington County Bridge Commission . . . . . . . . . . . . . . . Bridge Commission

That the State of New Jersey had and has a vested right to acquire an entire, as well as an undivided partial interest, in said bridges in accordance with the formula, terms and conditions set forth in the laws of the State of New Jersey and the Acts of Congress aforementioned and in addition to its usual sovereign right to acquisition by eminent domain the State of New Jersey was vested with the right to purchase the bridges after 20 years from their completion in accordance with the formula, terms and conditions set forth in the laws of New Jersey and Congress; that the 20 year period will expire on August 14, 1949 as to the Tacony-Palmyra Bridge and on May 1, 1951 as to the Burlington-Bristol Bridge, and that as of the expiration of the said 20 year periods the applicable price or value of the bridges would be approximately $5,000,000;

That under Chapter 318, Laws of New Jersey 1946, N.J.S.A. 27:19–26 et seq., Boards of Freeholders of any County were authorized to create Bridge Commissions with authority as set forth in said legislation; that by Chapter 288 of New Jersey Laws of 1948, the Legislature of New Jersey unconstitutionally amended Chapter 318 of New Jersey Laws of 1946, N.J.S.A. 27:19–26, et seq., in that the said amendment of 1948 is an abrogation and violation of the compact or agreement made between the Commonwealth of Pennsylvania and the State of New Jersey creating the Delaware River Joint Commission as a body corporate and politic, as set forth in N.J.S.A. 32:3-1 to 18, which compact was approved by the 72nd Congress of the United States by Public Resolution No. 26, June 14, 1932, 47 Stat. 308 and the said amendment of 1948 purports to grant to Bridge Commissions the right to acquire bridges as may be in part within the limits of the Commonwealth of Pennsylvania or of the Delaware River Joint Commission.

The "Information and Complaint" further charges that defendants Theodore R. Hanff, Clifford R. Powell, Tuthill Ketcham, Richard C. Nongard, Rowland H. Murray, Thomas J. Christensen, Robert K. Bell, Richard W. Parks, Fitzgerald & Co., Inc., B. J. Van Ingen & Co., Inc., and the Sarjem Corporation, between September 1, 1946 and the date of the filing of the "Information and Complaint", December 3, 1948, schemed and conspired to acquire and purchase all of the outstanding stock of the Burlington Bridge Company and of the Tacony Bridge Company and all the rights of the two companies in and to the said bridges respectively with the purpose thereafter to sell the said two bridges and the outstanding stock of the said two companies at an excessive and unconscionable price to a Bridge Commission which they and their agents would cause to be created for the County of Burlington by means of exercising coercion and undue influence upon the members of the Board of Freeholders of Burlington County and upon the members of the Burlington Bridge Commission that would be and afterward was created by the Board of Freeholders; by causing the creation of a bridge commission consisting of persons who would be entirely subservient to them and who would act obediently to their directions and would accept from them and their agents without using independent study and judgment legal opinions prepared by them and their agents as to the validity of the contemplated transactions and the value of the bridges and would thereupon adopt and pass resolutions prepared by them and their agents purporting to be resolutions of the Burlington Bridge Commission approving the purchase of the two bridges and the capital stock of the two bridge companies for the sum of $12,000,000 and issue bonds aggregating $12,400,000 to obtain the funds for the purpose of such purchases and would act in secrecy and with speed concealing the transaction from the public, the Government of the State and others lawfully and properly interested therein; and by means of fraud and misrepresentations, offer and promise of reward, and by counselling, aiding and abetting the members of the said Bridge Commission to act in violation of their public trust and in disregard of their duties to the public, the County of Burlington and State of New Jersey.

The plaintiffs claimed that on or about September 7, 1946 the defendants Powell, Hanff and their associates and agents en-

tered into an agreement to purchase the Burlington Bridge Company from its then owners either by a direct purchase of the bridge or by purchase of the outstanding stock of the said company for $1,350,000 and consummated the agreement in October 1947 when the defendants Hanff, Powell, Ketcham, Nongard, Murray, Christensen, Parks, Bell and Fitzgerald & Co., Inc., purchased the capital stock of the Burlington Bridge Company and covered the purchase price by notes and mortgages and investing a total of $50,000 in cash;

That pursuant to the alleged conspiracy, on May 1, 1948, Ketcham and defendant Robert M. Sherritt, President of the defendant Sarjem Corporation, agreed among themselves and proposed to purchase the capital stock of the Tacony-Palmyra Brige, and Sherritt was authorized by defendants Hanff, Ketcham, Nongard and Powell to proceed with the negotiations for option rights for the purchase of the capital stock of that company;

That Powell, on or about September 7, 1948, approached Frank Snover, a member of the Board of Freeholders, and proposed to him that Burlington County, by means of the appointment of a bridge commission, should purchase the two bridges for the sum of $12,000,000;

That on October 20, 1948 Powell met defendants Snover, Leroy Church, Stanley Russ and Clarence G. Price, members of the Board of Freeholders and represented to them that the purchase of the two bridges for $12,000,000 would be of great financial profit and benefit to Burlington County and that it could make the purchase without any investments or obligations and that $12,000,000 was a fair price for the bridges; Powell allegedly well knowing that the County could not derive under the Statutes of New Jersey and the Acts of Congress then in force any financial or pecuniary benefit from the purchase of said bridges and allegedly knowing that the said price of $12,000,000 was excessive, unconscionable and exorbitant; at the said conference Powell acting in concert and in conspiracy with other defendants concealed from the members of the Board of Freeholders material facts pertaining to the value of the said bridges and the price paid by the defendants and their associates for the acquisition of the bridges and the manner and method applied in the acquisition thereof;

That Powell called upon Thomas D. Begley on October 20, 1948 and advised him of the proposed meeting with the Freeholders of the County of Burlington later in the day, at which time it would be necessary to seek the advice of Begley in his capacity as counsel of the Board of Freeholders, and at the said conference Powell gave Begley a legal opinion theretofore prepared and suggested and directed Begley to rely upon and use the opinion upon the occasion of his advice to the Board of Freeholders, which Begley did;

That the following day, October 21, 1948, Snover met defendant Lichtenthal, and advised him of the plan to create a bridge commission, to appoint him as a member of it and to attend a meeting which would be held at the Hotel Barclay in Philadelphia the same day; that Powell informed defendant Howard R. Yocum in the City of Camden of the plan to create a bridge commission and to appoint him, defendant Lichtenthal, and the defendant Fred C. Norcross, Jr., as members thereof and advised Yocum to accompany Norcross to the meeting in the Hotel Barclay in Philadelphia, that on October 21, 1948 Powell and Snover promised Yocum, Norcross and Lichtenthal their appointments as members of the bridge commission at an annual salary of $3,000, it being then and there understood that they would approve and do all necessary acts for the accomplishment of the purchase of the two bridges by the bridge commission planned to be created, for the sum of $12,000,000, and that they would approve and take the necessary steps for the issuance of bonds to provide the funds for such purposes;

That on October 21, 1948, Yocum, Norcross, Litchtenthal, Begley, Powell, Price, Ketcham, Hanff, and David Wood, an attorney of New York, met at the Hotel Barclay in Philadelphia and Powell explained the details of the proceedings to consummate the purchase of the said

bridges by the proposed bridge commission and stated the necessity for speed and secrecy; that at this meeting Powell and his associates submitted to the prospective members of the bridge commission a voluminous set of resolutions' which they should accept as their resolutions approving the purchase of the two bridges for the sum of $12,000,000 and the steps necessary to consummate the transaction and to issue the bonds necessary therefor, and the said Yocum, Norcross and Lichtenthal were informed to present themselves at the Burlington County Court House in Mount Holly the following morning to be formally appointed by the Board of Freeholders as members of the Bridge Commission;

That on October 22, 1948 the Board of Freeholders appointed Yocum, Norcross and Lichtenthal as members of the Bridge Commission, whereupon they took oath of office as such members, went into session in the presence of several of the defendants and their associates, organized the Bridge Commission, appointing the necessary officers and immediately adopted and passed the series of resolutions theretofore prepared by Powell and his associates purporting to be the resolutions of the Bridge Commission, which showed submission of the proposal to purchase the bridges for the sum of $12,000,000 and to issue bonds to provide funds for such purchase, submission of same to the Board of Freeholders and purporting to show the consent and approval of the proposals and project by the Board of Freeholders, whereas Yocum, Norcross, Lichtenthal and Begley well knew the proposed project to purchase the bridges and to issue bonds therefor had not theretofore been submitted by the Bridge Commission to the Board of Freeholders as required by law and they had not received a duly enacted or adopted resolution or approval of the Board of Freeholders consenting to and approving the proposed purchase, project, and the issuance of bonds therefor;

That on the same day, October 22, 1948, Yocum, Norcross, Lichtenthal, Ketcham, Wood, Powell, Begley, Christensen, Hanff, Nongard, Sherritt, Russell Sherman, B. J. Van Ingen & Co., by its treasurer, the Chemical Bank and Trust Company, by its vice president, the Sarjem Corporation, by its officers and agents, met at the offices of the Chemical Bank and Trust Company in New York City and consummated the transaction for the purchase of the stock of the Burlington Bridge Company, which by previous merger and consolidation included the stock of the Tacony Bridge Company, for the price of $12,000,000, and Yocum, Norcross and Lichtenthal signed and delivered bonds in the sum of $12,400,000 of the Bridge Commission for the purchase thereof;

That the defendants Yocum, Norcross and Lichtenthal did not at any time as members of the Bridge Commission give due consideration to the matters proposed before them, did not submit the matters for approval and consent to the Board of Freeholders, did not receive such consent and approval of the Board of Freeholders and in all their actions purporting to be the official acts as members of the Bridge Commission they acted under the influence, coercion and will of Powell and his associates, having in fact and in effect totally abdicated their functions and duties as members and officers of said commission and that the Board of Freeholders did not in fact approve or consent to the proposal to acquire the said two bridges and to issue bonds for such purpose, as required by law;

That the said Yocum, Norcross and Lichtenthal, purporting to act as a Bridge Commission adopted resolutions for the purchase of the capital stock of the Burlington Bridge Company, whereas under the laws of the State of New Jersey they had no authority to purchase the capital stock of bridge companies, their authority being confined and limited to the purchase of bridges, wherefore, their resolutions for the purchase of the stock of the bridge company were void and did not form a lawful basis for the issuance of the bonds which are null and void and the action of the said members of the Bridge Commission in purchasing the capital stock of the Burlington Bridge Company resulted in burdening the said commission with all the liabilities of both the Burlington Bridge Company and the Tacony Bridge Company.

The plaintiffs claimed that it was the purpose of the defendants Hanff, Powell, Ketcham, Nongard, Murray, Christensen, Bell, Parks, Fitzgerald & Co., Inc., B. J. Van Ingen & Co., Inc., and The Sarjem Corporation to unjustly enrich themselves at the expense of the State of New Jersey and other states having occasion to use the said bridges and to deprive the State of New Jersey of its vested rights to acquire the said bridges alone or in conjunction with any other political subdivision of the State of New Jersey or of the Commonwealth of Pennsylvania in accordance with Chapter 247, Laws of 1925 and the Acts of Congress, Chapter 351, Session I, 1926 and Chapter 56, Session II, 1927, and of depriving the people of the State of New Jersey and of other states of the Union of the right to use the bridges at toll rates and for a period of time sufficient to pay only for the proper, reasonable and conscionable value of the said bridges and thereafter to use the bridges either free of tolls or at such rates of toll as would be sufficient to pay for maintenance, operation and incidental charges, as more fully described in the Acts of Congress aforesaid.

The following defendants were alleged to have either directly cooperated by concert of action in the formation or accomplishment of the conspiracy described in the "Information and Complaint", or with full knowledge of the nature of the transactions involved and the manner and method by which the said transactions were accomplished, wilfully participated in the profits, benefits, advantages and emoluments derived from said transactions: Leroy Church, Frank Snover, Clarence Price, Stanley Russ and Albert C. Jones, who were members of the Board of Freeholders; Yocum, Norcross and Lichtenthal, who were members of the Bridge Commission; Begley, counsel for the Board of Freeholders as well as the Bridge Commission; The Sarjem Corporation, an Illinois corporation; Sherritt, Ketcham, Nongard and Murray, investment bankers with offices in Chicago, who controlled and managed The Sarjem Corporation; Powell, director of Burlington Bridge Company; Robert K. Bell, legal advisor and director of the Burlington Bridge Company; Theodore R. Hanff, officer and large stockholder of the Burlington Bridge Company, and also an officer of T. R. Hanff & Co., allegedly used as a corporate device for the acquisition of securities; Christensen, stockholder and officer of Burlington Bridge Company; Richard W. Parks, Gladys A. Parks and Fitzgerald & Co., Inc., were stockholders of Burlington Bridge Company. The defendants B. J. Van Ingen & Co., Inc.; Buckley Securities Corporation; Stranahan, Harris & Co.; Blair & Co., Inc.; Bacon, Stevenson & Company, a partnership; Braun, Bosworth & Company, Inc., a corporation; Dolphin & Co., a partnership; Estabrook & Co., a partnership; Equitable Securities Corporation; Harris, Hall & Co., Inc., a corporation; John Nuveen & Co., a partnership; R. W. Pressprich & Co., a partnership; Tripp & Co., Inc., a corporation; Welsh, Davis & Co., a partnership; R. D. White & Co., a partnership; Robert Showers, individually; and Lyons & Shafto., Inc., a corporation, were corporations, firms and individuals engaged in the investment and banking business and were organizers and in control of the syndicate for the purchase, underwriting and marketing of the bonds which were prearranged to be issued by the Bridge Commission in the sum of $12,400,000, the said members of the syndicate having themselves subscribed in part for such issue.

The plaintiffs claim that any attempt or proposal to apply the provisions of Chapter 401, New Jersey Laws of 1947, N.J.S.A. 48:5–18, to bridges or any constructions by companies organized under Chapter 247, New Jersey Laws of 1925, N.J.S.A. 48:5–13 et seq., would be unconstitutional in that it would be in violation of Article IV, Section VII, Paragraph 11 of the Constitution of New Jersey of 1844, as amended, N.J.S.A., which is the same as Article IV, section 7, paragraph 9, subparagraph (8) of the new Constitution of 1947 N.J.S.A.; and Article I, Paragraph 20 of the Constitution of 1944, as amended, having the same effect as Article VIII, Section III, Paragraph 3 of the 1947 Constitution;

That the bonds of the Bridge Commission were signed, executed and delivered by the members of the Bridge Commission to Ketcham and Nongard and the said bonds

were thereupon deposited with the Chemical Bank and Trust Company, in accordance with an escrow agreement, copy of which is attached to the "Information and Complaint" as part of Exhibit A and that pursuant to the terms of the said escrow agreement on October 22, 1948 a deed was executed by Yocum, purportedly as president of the Tacony Bridge Company conveying the Tacony Bridge to the Burlington Bridge Company, and on the same day, October 22, 1948, a deed was executed by Yocum, purported president of the Burlington Bridge Company, conveying both bridges to the Bridge Commission, both of which deeds were recorded on October 29, 1948;

That the members of the Board of Freeholders and the purported members of the Bridge Commission acted in a fiduciary capacity in the negotiation and consummation of the transactions hereinbefore described;

That at most the transactions were under consideration by the Board of Freeholders and the Bridge Commission only during the period beginning the evening of October 20, 1948 and ending at 10 a. m. on October 22, 1948;

That the Bridge Commission was established and the transactions were purportedly authorized by resolutions adopted by the Board of Freeholders and by the Bridge Commission at meetings held during the morning of October 22, 1948;

That the various documents, described in the agenda, Exhibit B, attached to the "Information and Complaint", were executed and the transactions were consummated at the office of the defendant Chemical Bank and Trust Company, New York City, during the afternoon and night of October 22, 1948 and early morning of October 23, 1948, with extreme speed and absolute secrecy, free from the exercise of any discretion, initiative or independent judgment on the part of the members of the Bridge Commission and that the Board of Freeholders and the purported members of the Bridge Commission, acting in their respective fiduciary capacities, did not have or seek free and independent advice with respect to the transactions, but relied solely upon information furnished and representations made by the defendant Powell and his associates and upon information, opinions and advice furnished by lawyers, accountants and engineers employed and compensated by the defendant, the Burlington Bridge Company;

That the purchase price paid by the Bridge Commission in the consummation of the transaction was unconscionable, exorbitant, and constituted a flagrant waste of public funds.

The "Information and Complaint" then summarizes the charges as follows:

" (1) That by force and by virtue of the transactions hereinabove described in this information and complaint, the vested rights of the State of New Jersey to acquire in whole or in partial interest the two bridges or either of them hereinabove described, pursuant to rights reserved under Chapter 247, Laws of 1925, have been injured and jeopardized.

"(2) That the rights of the people of the State of New Jersey, as well as the people of other states in the Union who will have occasion to use the said bridges, are and will be injured and jeopardized by depriving them of the privilege to use the said bridges upon payment of reasonable toll charges for such length of time as would be reasonably necessary to pay for and to amortize a reasonable and conscionable purchase price for the said bridges in accordance with the Acts of Congress hereinabove set forth.

"(3) That the acts and conduct of the members of the Board of Chosen Freeholders of the County of Burlington in the creation of the Burlington County Bridge Commission and in appointing the three members thereof as hereinabove set forth were and are the result of fraud, misrepresentation, coercion, and undue influence, and violation of public duties, and utterly null and void and of no effect.

"(4) That the acts and conduct of the alleged members of the Burlington County Bridge Commission in purporting to have passed and adopted resolutions for the purchase of the bridges hereinabove described and for the purchase of the capital stock of the Burlington-Bristol Bridge Company were and are the result of fraud, misrepresentations, coercion, undue influence and

violation of public duties, and are utterly null and void and of no effect.

"(5) That the acts, conduct and resolutions of the alleged members of the Burlington County Bridge Commission authorizing and approving the purchase of the capital stock of the Burlington-Bristol Bridge Company were and are ultra vires, and beyond the scope of their powers, without sanction of law, and therefore null and void and of no effect.

"(6) That the acts, conduct and resolutions of the Burlington County Bridge Commission purporting to authorize and to approve the issuance of bonds in the aggregate of $12,400,000, for the purchase of the capital stock of the Burlington-Bristol Bridge Company, were without lawful authority or sanction, and were and are utterly null, void and of no effect.

"(7) That the combined and concerted actions of the defendants, and each of them, as hereinabove described, constituted a fraud and an opression [sic] upon the State of New Jersey, upon the county of Burlington, upon the Burlington County Bridge Commission, and upon the people of New Jersey and of other states having the need and the occasion to use the said bridges.

"(8) That the purchase, or purported purchase, of the Tacony-Palmyra Bridge by the Burlington County Bridge Commission was without the consent or approval of the appropriate authorities of the Commonwealth of Pennsylvania and in violation of the compact or agreement made and entered into by and between the State of New Jersey and the Commonwealth of Pennsylvania."

The prayer of the "Information and Complaint" is as follows: (1) that the defendants be required to answer, (2) that the resolutions of the Board of Freeholders purporting to create the Bridge Commission be declared null and void, (3) that the resolutions and actions of the Bridge Commission and the Board of Freeholders in purporting to authorize and approve the purchase of the bridges and of the capital stock of the Burlington Bridge Company and the issuance of bonds of the said commission in the total sum of $12,400,000 to provide funds for such purchases be declared null and void and of no effect.

"(4) And further that any and all contracts, agreements, bonds and other instruments executed or delivered by the Burlington County Bridge Commission in furtherance of the purported acquisition by it of the Tacony-Palmyra and Burlington-Bristol bridges and any and all acts done or performed in pursuance thereof, be set aside, rescinded and declared null and void and of no effect.

"(5) That the deeds of conveyance of the Burlington-Bristol Bridge and of the Tacony-Palmyra bridge hereinabove referred to, be set aside and declared null and void and of no effect.

"(6) That the defendants and each of them be enjoined from further negotiations, delivery, transmission or any other act or transaction in connection with the said bonds in the sum of $12,400,000 issued by thte Burlington County Bridge Commission or any part thereof.

"(7) That the Burlington-Bristol Bridge and the Tacony-Palmyra Bridge be returned and restored to the Burlington-Bristol Bridge Company and to the Tacony-Palmyra-Bridge Company, respectively, to be operated as toll bridges in the same manner and under the same conditions as prevailed prior to October 22, 1948.

"(8) That pending the accomplishment and the performance of the matters herein prayed for, a Receiver be appointed for the operation and maintenance of the Burlington-Bristol Bridge and the Tacony-Palmyra Bridge subject to further orders of this Honorable Court, and

"(9) That pending the setting aside and undoing of the acts hereinabove complained of, a receiver be appointed for all of the assets and other property of the Burlington-Bristol Bridge Company and of the Tacony-Palmyra Bridge Company in dissolution."

The plaintiffs moved to remand the action to the State court on the grounds that (1) there is no substantial dispute or controversy involving the effect or construction of the Constitution, laws and treaties of the United States upon which the result would depend; (2) this court did not have

original jurisdiction in the matters concerning the instant suit and it is peculiarly a legal proceeding to be disposed of in the courts of the State of New Jersey; (3) this is not a civil action founded upon a claim or right arising under the Constitution and laws of the United States and Acts of Congress regulating commerce; (4) that the State of New Jersey being a sovereign power is not a "citizen" within the removal statute; and (5) all of the defendants did not join and unite in the petition for removal of the said action to this court. In argument, however, only the grounds (1) of substantial dispute under the Federal Constitution and laws, and (5) of failure of all defendants to join in the removal petition were pressed. They will be discussed in reverse order.

The plaintiffs contend that the petition for removal is fatally defective in that all defendants served with process up to and on the date of the filing of the petition did not join in it and no reason was given for failure to include the other defendants. It was further contended that the proposal of petitioners to join several of the other defendants on the return day of the motion to remand did not validate the petition for removal and that the petitioners themselves, not having been served as defendants in the cause, have no standing to petition for removal.

The petitioners claim that at the time of filing the petition for removal, the docket and records of the New Jersey Superior Court wherein the suit had been instituted failed to disclose that any defendant had been served and that, therefore, no joinder of other defendants was necessary. They submit that if there is any requirement that the defendants served up to and on the filing date of the petition for removal should be included therein, the fact that all such defendants filed their consents to joinder in the petition on the return day of the motion to remove fulfilled the requirements. They deny that they are precluded from filing their petition for removal on the ground that they have not been served with process.

In the transcript of all proceedings in the Superior Court of New Jersey, Chancery Division, Burlington County, filed in this court, there are two affidavits of service by William P. Kelly. One affidavit shows that Kelly served the following defendants with an order to show cause and affidavit on December 3 and 4, 1948: Clifford R. Powell, Irene Powell, Paul A. Powell, Mildred R. Meader, Robert K. Bell, Thomas J. Christensen, Harry Burbank, Clerk of the Burlington County Board of Freeholders, Daniel Lichtenthal, Howard Yocum and Fred C. Norcross, Jr. The other affidavit shows that Kelly served a copy of the information and complaint on the same defendants on December 6, 1948. Both of the affidavits bear the stamp of the Clerk of the Superior Court of New Jersey disclosing that they were filed on December 9, 1948 but the hour of filing is not given. The separate affidavits of Elwood B. Allen and Robert Burke, show that on December 3, 1948, they deposited in the mail registered letters, with return receipts requested, containing true copies of the order to show cause and copies of the summons and information and complaint to other defendants. The petition for removal and accompanying papers were filed with the clerk of this court on December 9, 1948 at 9:45 a. m.

The date and hour of the filing of the petition for removal is known—December 9, 1948 at 9:45 a. m. It is now also known that some of the defendants were served with the information and complaint by Mr. Kelly on December 6, 1948. The proof of this service was required by Rule 3:4–7 of the Superior Court of New Jersey to be filed "promptly". It was not filed until December 9, 1948 at what hour the record does not disclose. In the light of the fact that the petition for removal was filed as early as 9:45 a. m. and in the absence of any proof to the contrary by the plaintiffs it is reasonable to assume that the petitioners could not have known from any record that the information and complaint had been served upon some of the defendants.

 The general rule is that all defendants must join in a petition for removal from a state court to a federal court if removal is sought on the ground that the action arises under the Constitution and laws of the United States. Chicago, Rock Island & Pacific Railway Co. v. Martin, 178 U.S. 245, 20 S.Ct. 854, 44 L.Ed. 1055.

The plaintiffs concede that the rule has been relaxed where defendants who were not served are concerned to the extent that such defendants may be disregarded. Pullman Co. v. Jenkins, 305 U.S. 534, 540, 59 S.Ct. 347, 83 L.Ed. 334. The rule of the latter case is applicable here although it dealt with diversity of citizenship and it has not been altered by the revised Judicial Code, 28 U.S.C.A. §§ 1441(a), 1448. Since the petitioners had no information from the official record that other defendants had been served on December 9, 1948 at 9:45 a. m. they were justified in disregarding the other defendants in filing their petition for removal.

In order to support their contention that the petitioners themselves not having been served as defendants in the state court action, have no standing to petition for removal, the plaintiffs cited the following quotation from the case of Philipbar v. Derby, D.C., 11 F.Supp. 709, at page 711: "It would seem self-evident that only the person who has been served has a status in the cause."

This language has been stripped from the context of the opinion and does not support the proposition advanced by the plaintiffs. The case concerned an action removed from a court in the State of New York to a federal court on grounds of diversity of citizenship. Only one defendant petitioned for removal, and he was served with a summons only. The plaintiff sought to remand on the grounds that the petition for removal was unauthorized because it did not appear that the other named defendants joined therein, that it was premature because the complaint had not been served, and the non-existence of diverse citizenship. In denying the motion to remand, the court stated:

"It would seem self-evident that only the person who has been served has a status in the cause. To contend that every one named as a defendant and who has not been served can block or interfere with the efforts of those who have been served, to move timely, is not convincing, and I am furnished with no authority in support of the proposition. Judge Lacombe said in Bowles v. H. J. Heinz Co. et al., C.C., 188

F. 937, 938, that a plaintiff, in such circumstances, 'could neglect to serve one of them until the time for removal by the one served had elapsed. Then he might serve the other and resist removal by him on the ground that the one first served did not join in application to remove, which, of course, he could not do since his right to make such application was barred by lapse of time.'

"Nor does it appear that because the complaint had not been served, the petition for removal was prematurely filed.

*　　*　　*　　*　　*　　*

"Though neither of these sections makes it necessary that the complaint be filed or served before the petition for removal is filed, it must appear from the transcript of the record filed in this court that complete diversity of citizenship exists. That is the showing made in the petition herein."

It is apparent that the Philipbar case fails to support the plaintiff's contention. On the contrary, the rule seems to have been in interpreting the old Judicial Code that defendants not served in the state court action could petition for removal of the cause to the federal court. Parkinson v. Barr, C.C., 105 F. 81; Yellowstone-Merchants National Bank v. Rosenbaum Bros. & Co., D.C., 277 F. 69; Trower v. Stonebreaker-Zea Live Stock Co., D.C., 17 F. Supp. 687. The revised Judicial Code apparently has not changed this rule for 28 U.S.C.A. § 1446(b) provides: "(b) The petition for removal of a civil action or proceeding may be filed within twenty days after commencement of the action or service of process, whichever is later." (Italics supplied.)

According to the Rules of Civil Practice of the Superior Court of New Jersey a civil action is commenced by filing a complaint with the court. Rule 3:3-1. Petitioners therefore were not precluded from filing the petition for removal simply because they had not been served with process.

Since the petitioners are properly before the court on their petition for removal it is not necessary to decide the question raised by plaintiffs in which they attack the consent to joinders by other defendants on the return date of the motion to remand.

In resisting the motion to remand the petitioners claimed that an analysis of the complaint reveals that basically it seeks to upset the transaction by which the Bridge Commission acquired the bridges. They insist that the bridges were purchased pursuant to two Acts of Congress. They urge that: "Here the sought for relief is based on the continued existence of federal rights in the state, the unconstitutionality under the United States Constitution of a state statute licensing the manner in which a political subdivision acquired the property pursuant to federal statutes, the existence of fraud stemming from an alleged interpretation of the federal statutes with reference to price paid and profit to be derived, and, finally, the assertion of impairment of the rights of the people of this and other states, rights allegedly derived from federal statutes."

The Act of May 21, 1926, c. 351, 44 Stat. 588 under which the consent of Congress was given to the construction of the Burlington Bridge contained the following provisions, among other things:

"Sec. 4. After the date of completion of such bridge, as determined by the Secretary of War, either the State of New Jersey, the State of Pennsylvania, any political subdivision of either of such States within or adjoining which any part of such bridge is located, or any two or more of them jointly, may at any time acquire and take over all right, title, and interest in such bridge and approaches, and interests in real property necessary therefor, by purchase, or by condemnation in accordance with the law of either of such States governing the acquisition of private property for public purposes by condemnation. If at any time after the expiration of twenty years after the completion of such bridge it is acquired by condemnation, the amount of damages or compensation to be allowed shall not include good will, going value, or prospective revenues or profits, but shall be limited to the sum of (1) the actual cost of constructing such bridge and approaches, less a reasonable deduction for actual depreciation in respect of such bridge and approaches, (2) the actual cost of acquiring such interests in real property, (3) actual financing and promotion costs (not to exceed 10 per cen-

tum of the sum of the cost of construction of such bridge and approaches and the acquisition of such interests in real property), and (4) actual expenditures for necessary improvements.

"Sec. 5. If such bridge shall be taken over and acquired by the States or political subdivisions thereof under the provisions of section 4 of this Act, the same may thereafter be operated as a toll bridge; in fixing the rates of toll to be charged for the use of such bridge, the same shall be so adjusted as to provide as far as possible a sufficient fund to pay for the cost of maintaining, repairing, and operating the bridge and its approaches, to pay an adequate return on the cost thereof, and to provide a sinking fund sufficient to amortize the amount paid therefor within a period of not to exceed thirty years from the date of acquiring the same. After a sinking fund sufficient to pay the cost of acquiring such bridge and its approaches shall have been provided, the bridge shall thereafter be maintained and operated free of tolls or the rates of toll shall be so adjusted as to provide a fund not to exceed the amount necessary for the proper care, repair, maintenance, and operation of the bridge and its approaches. An accurate record of the amount paid for acquiring the bridge and its approaches, the expenditures for operating, repairing, and maintaining the same, and of the daily tolls collected shall be kept, and shall be available for the information of all persons interested."

The Act of January 25, 1927, c. 56, 44 Stat. 1024, under which the consent of Congress was given to the construction of the Tacony Bridge contained identical provisions to those quoted above.

The New Jersey legislation pertinent to the bridges in question is found in the following enactments: Chapter 247 of the New Jersey Laws of 1925 provided that bridge companies organized under its terms consented to the acquisition by the State of New Jersey in conjunction with any adjoining state of any bridges constructed by the companies pursuant to a fixed cost formula at the expiration of five years from completion with a proviso that if the State failed to exercise the right of acquisition, title to the bridges would revert to the

State without cost fifty years from the date of completion of the bridges. N.J.S.A. 48:5–22 to 24. On July 1, 1931, an interstate compact was signed by the State of New Jersey and the Commonwealth of Pennsylvania providing for the Delaware River Joint Commission and specifying the duties and powers thereof. See N.J.S.A. 32:3–1 to 18. This compact was approved by a Joint Resolution of the 79th Congress on June 14, 1932, 47 Stat. 308. Article I of the compact provided for the promotion of the Delaware River as a highway of commerce between Philadelphia and Camden and the sea, featuring a comprehensive plan for the development of that objective. N.J.S.A. 32:3–2.

Chapter 17, New Jersey Laws of 1934 provided for the creation of a bridge commission by each county of New Jersey acting through its Board of Chosen Freeholders. N.J.S.A. 27:19–26 et seq. This act was amended by Chapter 318, New Jersey Laws of 1946 and granted authority to county bridge commissions to acquire bridges, with the consent of the adjoining state where the bridges extended therein; and with the approval of the Freeholders, to issue bonds secured by the tolls or other income from the operation of the bridges. N.J.S.A. 27:19–28. Chapter 401, New Jersey Laws of 1947 amended the Law of 1925 and authorized the sale of bridges constructed by corporations organized in compliance with the 1925 statute along with all their rights, privileges and franchises subject to all the statutory restrictions and limitations and provided that if the successors were bridge commissions, then the commissions' right to charge tolls would cease forty-five years after opening of the bridges. There was a further provision that any bridges so acquired would not be subject to acquisition by, or be the property of any state or states, municipality or municipalities and that the right of the commissions in the bridges would be perpetual. N.J.S.A. 48:5–18. An amendment, Chapter 288, New Jersey Laws of 1948, eliminated the provision for the consent of the adjoining state under the Law of 1946 and provided that bonds issued by the bridge commissions would be lawful trust investments. N.J.S.A. 27:19–28, 32.2.

The petitioners have been ingenious in their construction of a series of propositions which they alleged the plaintiffs *must* claim in order to obtain the relief which they seek, all of which, the petitioners assert, depend on the construction, validity, or effect of the laws or Constitution of the United States and hence are cognizable only in the federal court. These propositions are as follows:

"(1) The state of New Jersey had and has a vested right to acquire these bridges pursuant to the acts of the legislature of the state of New Jersey and the acts of Congress. These rights of the state have been injured and jeopardized as a result of the transaction, and those rights are sought to be vindicated by a recission of the transaction.

"(2) The 1948 statute of the state of New Jersey, authorizing the acquisition of these bridges without the consent of Pennsylvania, is unconstitutional (under the United States Constitution) in that it is in violation of the interstate compact between New Jersey and Pennsylvania which was approved by Congress.

"(3) Rescission is likewise sought on the ground that an excessive and unconscionable price was paid for the bridges as a result of fraud and undue influence. The propriety of the price must be tested by the formula, terms and conditions provided in the acts of Congress pursuant to which the purchase was accomplished.

"(4) Fraud is also predicated on the alleged fraudulent misrepresentations of defendants concerning the amount of profit to be gained by the county as a result of the transaction. The amount of profit likewise depends on the formula, terms and conditions of the acts of Congress. Should the profit be the amount as represented then the representation cannot be held fraudulent.

"(5) And finally, it is claimed that the transaction unjustly enriched defendants at the expense of the people of the State of New Jersey and of other states having occasion to use the bridges."

The petitioners argued that in order to determine what rights the state lost by reason of the purchase by the Bridge Com-

mission and to vindicate the State's rights, substantial federal questions must be decided. They insist that any right of the State to acquire the bridges by purchase twenty years after completion is granted only in the acts of Congress and that whether the State still has a right to acquire these bridges depends on the extent of the rights of the Bridge Commission acquired pursuant to and under the authority of the same acts of Congress. They assert that any other conclusion is negatived for under the 1925 New Jersey Statute, assuming the 1947 Act is unconstitutional, the State of New Jersey reserved to itself acting in conjunction with any adjoining states or municipalities thereof, the right to acquire the bridges five years after completion according to the formula therein set forth. On the other hand, under the acts of Congress, provision was made for the acquisition of the bridges by either the States or "by any political sub-division of either of such States." Therefore, the petitioners argue, these bridges could only have been acquired by the Bridge Commission pursuant to the federal acts. Thus there is need to determine the construction or effect of the acts of Congress in order to determine what rights the State lost by reason of the purchase by the Bridge Commission under authority of these acts.

On proposition (2), the petitioners argue that a federal question is raised because the plaintiffs alleged unconstitutionality of the New Jersey Statute of 1948 which eliminated the requirement of consent from an adjoining state as being in conflict with the compact between New Jersey and the Commonwealth of Pennsylvania since it acquired the force and effect of an act of Congress by reason of the approval by Congress of that compact. They contend that the 1948 New Jersey Statute can only be an unconstitutional violation of an act of Congress in so far as provided by the United States Constitution and the plaintiffs apparently conceded that their allegations of unconstitutionality were intended to refer only to the Federal Constitution.

On proposition (3) petitioners argue that since rescission is sought, the relief is grounded in large part on the allegations that the price paid for the bridges was excessive and unconscionable and that certain defendants were unjustly enriched by the sale of the bridges in excess of their true value. Therefore, the claimed basis of relief of rescission is the contrast between the price paid and the alleged value of the bridges as determined on the basis of the federal formula and is the substantive basis of the alleged fraud.

The petitioners submit that such terms as "actual costs" and "actual depreciation" used in the federal acts must be construed in order to determine the propriety of calculations under the federal formula and such interpretation can only be made in the federal court.

On proposition (4), the petitioners argue that the plaintiffs alleged it was fraudulently misrepresented to the Board of Freeholders and others that the purchase of the bridges would be of great financial profit and benefit to the county when it was known that the county would not derive pecuniary benefit from the purchase under the statutes of New Jersey or the acts of Congress. The petitioners contend that since the purchase of the bridges was undertaken pursuant to the acts of Congress, it is immaterial that a profit could not be made by a purchase pursuant to the New Jersey statutes, and that if it is established by the defendants that the county can make a profit under the acts of Congress or that they are so ambiguous that defendants representations cannot be held to be fraudulent, then plaintiffs' right to relief would be defeated. They further contend that a determination of the profit question rests on a construction of section 5 of the acts of Congress which provide that the rates of toll to be charged by a political subdivision which acquires the bridges shall include certain factors among which was a provision "to pay an adequate return on the cost thereof." The latter provision, it is submitted by the petitioners, is the source of a profit and the words must be construed in order to determine whether there is a basis for fraud as alleged in the complaint. As argued in the foregoing third proposition, the petitioners again assert that the construction of these words in the federal statute can only be made by a federal court.

On proposition 5, the petitioners argue that the information and complaint alleged that the purpose of the defendants was to unjustly enrich themselves by depriving the State of New Jersey of its vested rights under the state and federal statutes, and the people having occasion to use the bridges, of the right either free of tolls or at such rates as would be sufficient to pay for maintenance, operation and incidental charges as described in the acts of Congress. Therefore, whether defendants were unjustly enriched depends on whether the price paid was excessive. Again, petitioners urge, construction of the factors in the federal formula is essential and this can only be determined in a federal court. They also submit that the vindication of the rights of the people can only be accomplished by resorting to a construction of the acts of Congress called into question.

The propositions and arguments of the petitioners in support thereof neglect the gravamen of the complaint herein for the petitioners assume the legal creation of a valid bridge commission while the complaint in its essence charges that the Bridge Commission was created by unlawful and fraudulent acts of certain of the defendants combined with others and that it was designed to and did purchase the stock of the two bridge companies and the bridges in an unlawful manner to the injury of the State of New Jersey and the general public that would have occasion to use the bridges. This is found in the allegations that the defendants so influenced the Board of Freeholders of Burlington County that the independent judgment of the members thereof was not freely exercised in making the appointment of the members of the Bridge Commission. Sufficient appears from the face of the complaint to demonstrate that the valid organization of the Bridge Commission is challenged. The complaint goes further to specifically charge that the same undue influence which called the Bridge Commission into purported being, operated to deprive it of any judgment of its own and caused it to accept the proposals of the defendants without the kind of consideration and the use of judgment and discretion as was intended by the laws of New Jersey that it should

use in determining to purchase properties and pledge credit therefor. The federal legislation here in question provided a method of operation for the states named and their legally constituted political subdivisions to follow in acquiring bridge properties.

The remedy called for in the information and complaint is the rescission of the acts of the allegedly spurious Bridge Commission with a restoration of the bridge properties and their owner corporations to a status quo as they were prior to the alleged illegal transfer of stock and bridges from the vendor corporations. When this is borne in mind, in conjunction with the allegations of fraud in the information and complaint in the creation of the Bridge Commission and of its acts, it becomes plain that the construction of the federal acts authorizing acquisition of the bridges will not be determinative of the fundamental issue and is indeed remote therefrom.

▮▮▮ The mere fact that a federal statute was invoked by the Bridge Commission in purchasing the bridges in question does not render the question concerning the validity of the purchase one which may be determined only in the federal jurisdiction. In the case of Puerto Rico v. Russell & Co., 288 U.S. 476, at page 483, 53 S.Ct. 447, 449, 77 L.Ed. 903, the court said:

"Federal jurisdiction may be invoked to vindicate a right or privilege claimed under a federal statute. It may not be invoked where the right asserted is non-federal, merely because the plaintiff's right to sue is derived from federal law, or because the property involved was obtained under federal statute. The federal nature of the right to be established is decisive—not the source of the authority to establish it. Shoshone Mining Co. v. Rutter, 177 U.S. 505, 20 S.Ct. 726, 44 L.Ed. 864; Blackburn v. Portland Gold Mining Co., 175 U.S. 571, 20 S.Ct. 222, 44 L.Ed. 276; Little York Gold-Washing & Water Co. v. Keyes, 96 U.S. 199, 203, 24 L.Ed. 656; see McGoon v. Northern Pacific Ry. Co., D.C., 204 F. 998, 1001; compare Swafford v. Templeton, 185 U.S. 487, 22 S.Ct. 783, 46 L.Ed. 1005. The case is analogous to those involving rights

to land granted under laws or treaties of the United States. Where the complaint shows only that such was the source of the plaintiff's title, the case is not one within the jurisdiction of the federal courts. Barnett v. Kunkel, 264 U.S. 16, 20, 44 S.Ct. 254, 68 L.Ed. 539; Shulthis v. McDougal, 225 U.S. 561, 32 S.Ct. 704, 56 L.Ed. 1205; Devine v. Los Angeles, 202 U.S. 313, 337, 26 S.Ct. 652, 50 L.Ed. 1046; compare Hopkins v. Walker, 244 U.S. 486, 489, 37 S.Ct. 711, 61 L.Ed. 1270; Lancaster v. Kathleen Oil Co., 241 U.S. 551, 36 S.Ct. 711, 60 L.Ed. 1161; Wilson Cypress Co. v. Del Pozo, 236 U.S. 635, 643, 35 S.Ct. 446, 59 L.Ed. 758; Northern Pacific Ry. Co., v. Soderberg, 188 U.S. 526, 23 S.Ct. 365, 47 L.Ed. 575. * * *

"A state brought into the federal Union by act of Congress is likewise a political entity, and although not a citizen of the United States within the meaning of the statutes conferring jurisdiction on federal courts, Stone v. South Carolina, 117 U.S. 430, 6 S.Ct. 799, 29 L.Ed. 962; Postal Telegraph Cable Co. v. Alabama, 155 U.S. 482, 15 S.Ct. 192, 39 L.Ed. 231; see [State of] Arkansas v. Kansas & Texas Coal Co., 183 U.S. 185, 22 S.Ct. 47, 46 L.Ed. 144, a suit brought by it presenting a federal question is within the jurisdiction of the district courts. New Orleans, M. & T. Railroad Co. v. Mississippi, 102 U.S. 135, 140, 26 L.Ed. 96; Ames v. Kansas, 111 U.S. 449, 4 S.Ct. 437, 28 L.Ed. 482; Southern Pacific R. Co. v. California, 118 U.S. 109, 6 S.Ct. 993, 30 L.Ed. 103. But, a suit does not arise under the Constitution or laws of the United States merely because a state is the plaintiff, though the state derives its authority to maintain the suit from the Federal Constitution and laws. Postal Telegraph Cable Co. v. Alabama, supra, 155 U.S. 487, 15 S.Ct. 192 [194], 39 L.Ed. 231; Minnesota v. Northern Securities Co., 194 U.S. 48, 24 S.Ct. 598, 48 L.Ed. 870; Germania Insurance Co. v. Wisconsin, 119 U.S. 473, 475, 7 S.Ct. 260, 30 L.Ed. 461; [State of] Arkansas v. Kansas & Texas Coal Co., supra; see Missouri, Kansas & Texas Ry. Co. v. [Hickman et al.] Commissioners, 183 U.S. 53, 58, 22 S.Ct. 18, 46 L.Ed. 78; Stone v. South Carolina, supra, 117 U.S. 433, 6 S.Ct. 799 [800], 29 L.Ed. 962."

This principle was reemphasized in Gully v. First National Bank, 299 U.S. 109, at page 116, 57 S.Ct. 96, at page 99, 81 L.Ed. 70, where the court stated: "We recur to the test announced in Puerto Rico v. Russell & Co., supra: 'The federal nature of the right to be established is decisive—not the source of the authority to establish it.' Here the right to be established is one created by the state. If that is so, it is unimportant that federal consent is the source of state authority. To reach the underlying law we do not travel back so far."

These decisions have equal impact upon the argument used by the petitioners that because the compact between the State of New Jersey and Commonwealth of Pennsylvania creating the Delaware River Joint Commission was approved by a resolution of Congress it became federal law and that questions concerning the compact could be litigated only in the federal jurisdiction. They have particular force in this case where the allegations in the information and complaint do not assume any form of controversy between the State of New Jersey and Commonwealth of Pennsylvania but are rather charges by the plaintiffs that an act of the legislature of New Jersey is in conflict with a previous agreement or treaty with a sister state which incidentally has the approval of Congress.

The petitioners embrace the theory that the fundamental and basic public rights to which the plaintiffs must look in this litigation are to be found in the federal acts and therefore federal questions are raised which may be determined only under the federal jurisdiction. On the other hand, the face of the complaint discloses that the plaintiffs go to deeper foundations. They claim that the Bridge Commission was a nullity from its very beginning for it was allegedly conceived and born in fraud, that its acts were void, that in equity the plaintiffs are entitled to have its acts rescinded, and the matters and things with which it dealt restored to their status quo. What the Bridge Commission

did or could do by virtue of the federal legislation, is solely evidentiary of and incidental to the main issue raised in the complaint. Likewise the issue of the constitutionality of the New Jersey Statutes under which the Bridge Commission assumed to act are ancillary to the inquiry into the validity of its creation and its acts. The following language used in the Gully case is apt on the question at bar: "The most one can say is that a question of federal law is lurking in the background, just as farther in the background there lurks a question of constitutional law, the question of state power in our federal form of government. A dispute so doubtful and conjectural, so far removed from plain necessity, is unavailing to extinguish the jurisdiction of the states." 299 U.S. at page 117, 57 S.Ct. at page 99, 81 L.Ed. 70.

The above case, Gully v. First National Bank, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70, contains the most recent pronouncements of the Supreme Court concerning the principles of removal as founded upon the allegation that a cause arose under the Constitution and laws of the United States. In it the plaintiff, Gully, a state tax collector, brought suit in a Mississippi court against the First National Bank in Meridian which, in acquiring assets of an insolvent national bank, had assumed and covenanted to pay the debts and liabilities of the latter. The complaint alleged that among the debts so assumed were moneys owing by the insolvent bank for taxes assessed upon its capital stock, surplus, and undivided profits exclusive of the value of its real estate tax. Under Mississippi law all taxes thus assessed were debts owing by the shareholders of the insolvent bank which that bank was under a duty to pay, as their agent, out of moneys belonging to them then in its possession and that the bank in violation of its covenant failed to pay the taxes of its insolvent predecessor. The case was removed to the federal district court upon the ground that the suit was one arising under the Constitution and laws of the United States and there tried over the plaintiff's motion to remand. His complaint was dismissed after a trial on the merits and the Circuit Court of Appeals for the Fifth Circuit, 81 F.2d 502, affirmed the judgment and overruled the objection that the cause was triable in the state court upon the ground that the power to lay a tax upon the shares of national banks had its "origin and measure" in a federal statute, 12 U.S.C.A. § 548, and that by necessary implication the plaintiff rested upon that statute in suing for the tax. The United States Supreme Court reversed and remitted the cause to the district court with instructions to remand it to the state court because it held that the suit was upon a contract having its genesis in the law of the state, enforcement of which had no necessary connection with the existence of a controversy arising under federal law. While the tax sought to be recovered had to be consistent with the federal statute which permitted state taxation of national bank shareholders, its basis was a statute of the state. During the course of the opinion the following basic principles were enunciated, 299 U.S. at pages 112-114, 57 S. Ct. at page 97, 81 L.Ed. 70:

"To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. Starin v. New York, 115 U.S. 248, 257, 6 S.Ct. 28, 29 L. Ed. 388; First National Bank v. Williams, 252 U.S. 504, 512, 40 S.Ct. 372, 374, 64 L. Ed. 690. The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another. Id; King County v. Seattle School District, 263 U.S. 361, 363, 364, 44 S.Ct. 127, 128, 68 L.Ed. 339. A genuine and present controversy, not merely a possible or conjectural one, must exist with reference thereto ([City of] New Orleans v. Benjamin, 153 U.S. 411, 424, 14 S.Ct. 905, 38 L.Ed. 764; Defiance Water Co. v. Defiance, 191 U.S. 184, 191, 24 S.Ct. 63, 48 L.Ed. 140; Joy v. St. Louis, 201 U.S. 332, 26 S.Ct. 478, 50 L. Ed. 776; City & County of Denver v. New York Trust Co., 229 U.S. 123, 133, 33 S. Ct. 657, 57 L.Ed. 1101), and the controversy must be disclosed upon the face of the complaint, unaided by the answer or by the petition for removal. [State of] Tennessee v. Union & Planters Bank, 152 U.S. 454,

14 S.Ct. 654, 38 L.Ed. 511; Louisville & Nashville R. Co. v. Mottley, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126; The Fair v. Kohler Die & Specialty Co., 228 U.S. 22, 25, 33 S.Ct. 410, 57 L.Ed. 716; Taylor v. Anderson, 234 U.S. 74, 34 S.Ct. 724, 58 L. Ed. 1218. Indeed, the complaint itself will not avail as a basis of jurisdiction in so far as it goes beyond a statement of the plaintiff's cause of action and anticipates or replies to a probable defense. Devine v. Los Angeles, 202 U.S. 313, 334, 26 S.Ct. 652, 50 L.Ed. 1046; The Fair v. Kohler Die & Specialty Co., supra.

"Looking backward we can see that the early cases were less exacting than the recent ones in respect of some of these conditions. If a federal right was pleaded, the question was not always asked whether it was likely to be disputed. This is seen particularly in suits by or against a corporation deriving its charter from an act of Congress. Osborn v. Bank of the United States, 9 Wheat. 738, 817-828, 6 L.Ed. 204; Pacific Railroad Removal Cases, Union Pacific Railway Co. v. Myers, 115 U.S. 1, 11, 5 S.Ct. 1113, 29 L.Ed. 319. Modern statutes have greatly diminished the importance of those decisions by narrowing their scope. Gay v. Ruff, 292 U.S. 25, 35, 54 S.Ct. 608, 613, 78 L.Ed. 1099, 92 A.L.R. 970; Puerto Rico v. Russell & Co., 288 U.S. 476, 483, 53 S.Ct. 447, 449, 450, 77 L.Ed. 903. Federal incorporation is now abolished as a ground of federal jurisdiction except where the United States holds more than one-half the stock. Act of February 13, 1925, c. 229, § 12, 43 Stat. 936, 941, [now 28 U.S.C.A. § 1349]. Partly under the influence of statutes disclosing a new legislative policy, partly under the influence of more liberal decisions, the probable course of the trial, the real substance of the controversy, has taken on a new significance. 'A suit to enforce a right which takes its origin in the laws of the United States is not necessarily, or for that reason alone, one arising under those laws, for a suit does not so arise unless it really and substantially involves a dispute or controversy respecting the validity, construction, or effect of such a law, upon the determination of which the result depends.' Shulthis v. McDougal, 225 U.S. 561, 569, 32 S.Ct. 704, 706, 56 L.Ed. 1205. Cf. First National Bank v. Williams, supra; Hopkins v. Walker, 244 U.S. 486, 489, 37 S.Ct. 711, 61 L. Ed. 1270; Shoshone Mining Co. v. Rutter, 177 U.S. 505, 507, 20 S.Ct. 726, 44 L.Ed. 864. Only recently we said after full consideration that the doctrine of the charter cases was to be treated as exceptional, though within their special field there was no thought to disturb them. Puerto Rico v. Russell & Co., supra. 'We should fly in the face of this legislative policy and disregard precedents which we think controlling were we to extend the doctrine now.' Id. Today, even more clearly than in the past, 'the federal nature of the right to be established is decisive—not the source of the authority to establish it.' Id."

As contended by the petitioners, it well may be necessary to resort to the federal acts to determine what would be the purchase price of the bridges as contemplated therein as the calculation may bear upon the charges of excessively illegal private profits contained in the information and complaint. But as the plaintiffs argue, the mere necessity for reference to and construction of the federal acts does not create the substantial and basic question under this complaint. In such case the federal acts may be drawn in collaterally in the way of evidence relevant to the truth or falsity of the allegations which create the basic issue. If, in the course of the litigation such a contingency arises, as was stated in the case of Defiance Water Co. v. Defiance, 191 U.S. 184, at page 193, 24 S.Ct. 63, 67, 48 L.Ed. 140: "* * * state courts are perfectly competent to decide Federal question arising before them, and it is their duty to do so."

and in the case of Gold Washing Co. v. Keyes, 96 U.S. 199, at page 203, 24 L.Ed. 656: "A cause cannot be removed from a state court simply because in the progress of the litigation, it may become necessary to give a construction to the Constitution or laws of the United States."

The petitioners claimed that a number of cases similar to the instant case present situations which indicate that the pertinent rules have been consistently applied in such a way as to warrant the conclusion

that this suit is one "founded on a claim or right arising under the Constitution, treaties or laws of the United States." They urged the following cases as authority: New Orleans, M. & T. R. Co. v. Mississippi, 102 U.S. 135, 26 L.Ed. 96; People of State of Illinois ex rel. Attorney General v. Illinois Central R. Co., C.C., 16 F. 881; Id., C.C., 33 F. 721; People v. Sanitary District of Chicago, C.C., 98 F. 150; Great Northern Ry. Co. v. Galbreath Cattle Co., 271 U.S. 99, 46 S.Ct. 439, 70 L.Ed. 854; McGoon v. Northern Pac. Ry. Co., D.C., 204 F. 998; Hartford Fire Ins. Co. v. Kansas City, M. & O. Ry. Co., D.C., 251 F. 332; Smith v. Kansas City T. & T. Co., 255 U.S. 180, 41 S.Ct. 243, 65 L.Ed. 577; and Downey v. Geary-Wright Tobacco Co., D.C., 39 F.Supp. 33.

In the New Orleans M. & T. Railroad Co. case, the State of Mississippi petitioned one of its courts for a writ of mandamus to compel the Railroad Company to remove a stationary bridge over the Pearl River on the line between Louisiana and Mississippi and to construct a drawbridge in its place which would give passageway for vessels. The State claimed that the stationary bridge obstructed navigation of the river, was in violation of the company's charter, and a public nuisance to the damage of the people of Mississippi; that by an Act of Congress under which the State of Mississippi was admitted into the Union there was an engagement on the part of the United States that the Pearl River, among other waterways, should be free to all inhabitants of the State of Mississippi; and that the bridge in question was an obstruction to navigation upon it. The Railroad sought removal to the federal court on the ground that the bridge in question had been constructed under an act of Congress whereby it was authorized to construct and maintain bridges across navigable waters on the route of its railroad between Mobile and New Orleans which was to be recognized as a post road and that Congress reserved to itself the power to alter them when they became an obstruction to the navigable waters. It contended that there was raised in the case a real and substantial controversy which depended upon the construction and effect of an act of Congress. The Supreme Court held that the defendant's petition for removal should have been granted and stated: "While the case raises questions which may involve the construction of State enactments, and also, perhaps, general principles of law, not necessarily connected with any Federal question, the suit otherwise presents a real and substantial dispute or controversy which depends *altogether* upon the construction and effect of an act of Congress." 102 U.S. at pages 139, 140, 26 L.Ed. 96. (Italics supplied.)

The petitioners point to the further language of the court as follows: "That it is not sufficient to exclude the judicial power of the United States from a particular case, that it involves questions which do not at all depend on the Constitution or laws of the United States; but when *a* question to which the judicial power of the Union is extended by the Constitution forms an ingredient of the original cause, it is within the power of Congress to give the Circuit Courts jurisdiction of that cause, although other questions of fact or of law may be involved in it." 102 U.S. at page 141, 26 L.Ed. 96. (Italics by the petitioner.)

In reliance upon these pronouncements the petitioners herein contend that there is in the instant case also a question dependent upon the construction or effect to be given federal statutes which makes the case removable, forming an ingredient of the original cause. However, in the cited case, there was a real and substantial controversy which depended *altogether* on the construction of acts of Congress constituting an ingredient of the original cause. In the case before us resort to the necessity for an interpretation of the federal acts can only come collaterally to the real and substantial issues provoked by the complaint which are entirely aside from the federal acts or their interpretations. The language in the cited case is strongly in favor of federal jurisdiction because the facts and circumstances in that case pit federal legislation against federal legislation as the real and substantial issue. The light of the Gully case illuminates the "ingredient" theory of Railroad v. Mississippi with the following language: "Some tests are well established. To bring a case within the

statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. * * * The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect and defeated if they receive another." 299 U.S. at page 112, 57 S.Ct. at page 97, 81 L.Ed. 70.

Applied to the case of Railroad v. Mississippi this would have been consistent with the decision found therein. Applied to the instant case we find no such right or immunity created by the federal acts as an essential element of the cause of action nor would it rise or fall as effect is given to those federal acts. Such effect as may be given to them at most will be evidentiary on the real and substantial issues which revolve around charges entirely cognizable under the state jurisdiction.

The Illinois Central R. Co. case involved a dispute as to the title to submerged lands of Lake Michigan. The court therein stated: "An analysis of the pleadings will show (1) that the relief which the state seeks depends, in part, upon the construction, operation, and effect of Virginia's act of cession, and the acts of congress creating the territory and admitting the state of Illinois into the Union; (2) that, apart from the case as made by the information, the rights of both parties depend, mainly, upon the inquiry whether the act of the Illinois legislature passed in 1873—set out both in the information and the answer— is in violation of those clauses of the national constitution to which reference is made in the answer." 16 F. 881, 886.

It presented a real and substantial dispute governed by the Constitution and laws of the United States, the conflicting claims being supported if one construction or effect was given or defeated if they received another, a situation not existing in the present action.

In the Sanitary District of Chicago case, the State of Illinois claimed that a right had accrued to it to have the Chicago River maintained at its then level at the point of connection of the Illinois & Michigan Canal which it alleged an act of Congress required it to maintain as a navigable waterway for the free passage of any property. After a review of the complaint, the Circuit Court denied a motion to remand holding that a federal question was presented on the authority of New Orleans, M. & T. Railroad Co. v. Mississippi since antagonistic constructions of the acts of Congress involved would determine the rights claimed by the State and the relief requested in the bill of complaint. Such a determination cannot be claimed upon the basis of the federal acts in the instant case.

The Galbreath Cattle Case, the McGoon case, and the Hartford Insurance case all involved suits for damages to cattle shipped in interstate commerce under a federal act known as the Carmack Amendment, 49 U.S.C.A. § 20. Hence they presented real and substantial federal questions and have no application here.

The Smith case was a shareholder's action to enjoin directors of a Trust company from investing funds in bonds of a Federal Land Bank and Joint Stock Land Bank upon the ground that an act of Congress authorizing creation of such banks and the issue of such bonds, was unconstitutional. The complaint was held to state a cause of action within the original jurisdiction of a federal district court because the constitutionality of an act of Congress was directly drawn into question and the decision depended upon the determination of this issue unlike the issue in this case.

In the Downey case, the plaintiff brought an action in a state court against a tobacco warehouse company alleging that the company made illegal and confiscatory deductions from the amount of the plaintiff's crop and prayed for an accounting and for judgment declaring rights and duties of the parties. The defendant petitioned for removal. Although the complaint was framed as a common law action in assumpsit, the court, on analysis found, after taking judicial notice, that the action was governed by the terms of the Agriculture Adjustment Act of 1938, 7 U.S.C.A. § 1311 et seq., and granted removal since the complaint disclosed a controversy of such nature that it could only be correctly determined by a declaration of the law in the light of the

federal statute and the regulations made pursuant to it. Again, this is distinguishable from the issue raised by the present complaint.

With a fine prescience anticipatory of the questions raised in the case at bar, Mr. Justice Cardozo offered the following "guide to the perplexed" in the final passage of the Gully case: "This Court has had occasion to point out how futile is the attempt to define a 'cause of action' without reference to the context. United States v. Memphis Cotton Oil Co., 288 U. S. 62, 67, 68, 53 S.Ct. 278, 280, 77 L.Ed. 619. To define broadly and in the abstract 'a case arising under the Constitution or laws of the United States' has hazards of a kindred order. What is needed is something of that common-sense accommodation of judgment to kaleidoscopic situations which characterizes the law in its treatment of problems of causation. One could carry the search for causes backward, almost without end. Bird v. St. Paul F. & M. Insurance Co., 224 N.Y. 47, 51, 120 N.E. 86, 13 A.L.R. 875; Leyland Shipping Co. v. Norwich Fire Insurance Society, [1918] A. C. 350, 369; Aetna Insurance Co. v. Boon, 95 U.S. 117, 130, 24 L. Ed. 395; Milwaukee & St. Paul R. Co. v Kellogg, 94 U.S. 469, 474, 24 L.Ed. 256. Instead, there has been a selective process which picks the substantial causes out of the web and lays the other ones aside. As in problems of causation, so here in the search for the underlying law. If we follow the ascent far enough, countless claims of right can be discovered to have their source or their operative limits in the provisions of a federal statute or in the Constitution itself with its circumambient restrictions upon legislative power. To set bounds to the pursuit, the courts have formulated the distinction between controversies that are basic and those that are collateral, between disputes that are necessary and those that are merely possible. We shall be lost in a maze if we put that compass by." 299 U.S. 117, 118, 57 S.Ct. at page 100, 81 L. Ed. 70.

The search here reveals as basic, real and substantial the issues of whether there was a fraudulent and illegal organization of the Bridge Commission and whether its acts

were invalid. The provisions of the federal acts furnish no essential element of those issues and the construction or effect of the federal acts will not determine the basic issues. Hence they are cognizable under the jurisdiction of the state court and the case must be remanded.

An order in conformity with this opinion should be noticed for settlement.